UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**TRACY JONES, et al.**,  Case No. 3:10 CV 2261

    Plaintiffs,  Judge Jack Zouhary

    v.  REPORT AND RECOMMENDATION

**SANDUSKY COUNTY, OHIO, et al.,**

    Defendants.  Magistrate Judge James R. Knepp II

## INTRODUCTION

This case arises from the tragic shooting and killing of Bryan Jones by Sandusky County Sheriff's Deputies. Bryan's parents, Tracy and Kim Jones, brought this suit as administrators of Bryan's estate, alleging the deputies who shot Bryan, Mario and Jose Calvillo, as well as Sheriff Kyle Overmyer, and Sandusky County, violated 42 U.S.C. § 1983 and various state laws.

Pending before the Court are cross-motions for summary judgment. (Docs. 39-1 & 41). Both parties have opposed the other's Motion (Docs. 50 & 52), as well as filed replies (Docs. 57 & 59). The Court also heard oral argument on December 1, 2011. (Non-Document Entry,12/1/2011).

## BACKGROUND

In July 2010, Tracy Jones was leaving the Jones' family residence when he got into a verbal confrontation with his son Bryan. Bryan told Tracy "your old lady's dead. Click, click." (Doc. 41-2, at 80).[1] Bryan also told Tracy he would get a gun and that Tracy should "[g]o ahead and call the

---

[1] For the sake of clarity, all record citations are made to the CM/ECF document number followed by the PDF page number found at the top of the document. However, in the case of depositions, the document number is followed by the deposition page number, not the PDF page number.

police". (*Id.* at 81). Tracy then went to his son Brandon's home, approximately a half-mile away. From there, Tracy called 9-1-1, and told the dispatcher Bryan had threatened to kill his mother, Kim Jones; had a loaded gun; was acting "crazier than heck"; had been drinking for two days; and would fight if Tracy called the police. (Doc. 39-9, at 2–7).

The dispatcher notified deputies to respond, telling them Bryan was "going to kill everybody and himself", (although Plaintiffs contend, and the record supports, Tracy did not tell the dispatcher Bryan was suicidal). (Doc. 39-9, at 7–8). Deputies responded to the Jones' home, and by peering in the living room window, found Bryan seated with his feet propped up on a coffee table with a shotgun laying across his lap. Bryan's eyes were closed, but he moved occasionally. (Doc. 39-6, at 13). One of the deputies asked dispatch to obtain a phone number for the house to try and make contact with Bryan, which she did; however, the dispatcher was unable to make contact. (Doc. 39-2, at 9).

Sheriff Kyle Overmyer was also alerted to the complaint and called to the scene. While en route, Sheriff Overmyer recalled Bryan had been a part of a drive-by-shooting in the past, which dispatch confirmed. (Doc. 39-9, at 17–18). Once on scene, Sheriff Overmyer made the decision to activate the Tactical Response Team (TRT), the County's equivalent of S.W.A.T. The members of this team available on this particular night were Deputies Jose Calvillo, Mario Calvillo, Kevin Karn, and Allen Dorsey. (Doc. 39-9, at 37, 39).

Officers continued to observe Bryan in the living room through an exterior window and did so for approximately an hour and a half. Over this time period, Bryan moved very little and appeared to either be sleeping or passed out. Sheriff Overmyer was also concerned Bryan may have overdosed, inflicted injury to himself, or was playing opossum. (Doc. 41-5, at 120–24; Doc. 41-7,

at 48–49; 83–84). Based on those concerns, Sheriff Overmyer decided the TRT should make entry into the Jones' home and remove Bryan. (*Id.*).

To aide in the entry, Tracy Jones was called to the scene to inform officers as to the layout of the house. (Doc. 41-2, at 93). Tracy told officers the back door was open and did not object to their entry plan. (*Id.*). Tracy did, however, ask permission to enter the home in order to retrieve Bryan, but was denied entry. He was instead placed with a highway patrolman and taken approximately 45 yards from the home. (*Id.* at 95). Sheriff Overmyer and TRT leader Jose Calvillo devised an entry plan, which involved the TRT entering through the backdoor, deploying a diversionary flash-bang device, and then approaching Bryan and taking the gun. (Doc. 39-4, at 8).

At approximately 11:30 p.m., Deputy Dorsey opened the back door and the three other TRT members entered into the home and made their way into the kitchen, which adjoined the living room. (Doc. 39-6, at 22–24). Deputy Dorsey stayed behind. Deputy Karn peaked around the corner and threw the flash-bang, which detonated as expected. (Doc. 39-7, at 16). The team then moved forward, repeatedly identifying themselves as Sheriff's deputies and telling Bryan to put the gun down. (Doc. 39-4, at 13; Doc. 39-7, at 20).

Bryan, however, did not put the gun down, according to all three deputies present. Deputy Karn stated he saw the barrel of Bryan's gun rise six to ten inches and point it at the team, and so Karn took cover behind a cabinet. (Doc. 39-7, at 21). Mario Calvillo saw the muzzle of Bryan's shotgun move from the position it was originally pointed (away from the team) toward the team, until he was looking down the barrel of the gun. (Doc. 39-5, at 9). Jose Calvillo saw the same movement, and yelled at Bryan to stop. Doc. 39-4, at 14). All three deputies felt as though Bryan intended to shoot. (Doc. 39-4, at 14; Doc. 39-5, at 9; 39-7, at 21–22). In response, both Jose and

Mario Calvillo opened fire, killing Bryan.

### DISCUSSION

#### Standard of Review

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034, 274 (D.C. Cir. 1988)).

When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

#### Qualified Immunity Framework

Plaintiffs claim Defendants violated the Fourth Amendment, and are thus liable under 42 U.S.C. § 1983, for actions surrounding the shooting death of Plaintiffs' son Bryan. Defendants counter by invoking qualified immunity as a defense. If it applies, qualified immunity is a defense not just against liability, but against suit itself. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

Qualified immunity shields government officials from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson*, 129 S. Ct. at 815. Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded the actions taken were unlawful. *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). Qualified immunity applies whether the official's mistake was one of law or fact, or a mistake based on mixed questions of law and fact. *Pearson*, 129 S. Ct. at 815.

Plaintiffs bear the burden of showing that defendants are not entitled to qualified immunity. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). Plaintiffs must show both that, viewing the evidence in the light most favorable to them, (1) a constitutional right was violated and (2) the right was clearly established at the time of the violation. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). If Plaintiffs fail to show either that a constitutional right was violated or that the right was clearly established, they will have failed to carry their burden. *Id.* Moreover, to satisfy the second prong of the standard, Plaintiffs must show the right was clearly established in a "particularized sense," such that a reasonable officer confronted with the same situation would have known that using deadly force would violate that right. *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004). In determining whether the required showing has been made, the court has discretion to decide which of the two elements to address first. *Pearson*, 129 S. Ct. at 818.

**Fourth Amendment Claims**

Plaintiffs attempt to overcome Defendant's qualified immunity defense by first arguing the force used by Deputies Jose and Mario Calvillo against Bryan was objectively unreasonable. Plaintiffs contend "[t]he actions of Defendants Jose and Mario Calvillo, by putting themselves in direct confrontation with Bryan, while in his home, knowing that Bryan was sleeping; using a flash-bang instead of negotiations, while his father stood near by, was objectively unreasonable." (Doc. 52, at 19–20).

Only in their Reply brief (Doc. 59, at 5) do Plaintiffs allege a second Fourth Amendment violation occurred: Defendants' entry into Plaintiffs' home.  Although this argument may have been raised late, Sixth Circuit precedent dictates these two alleged violations be analyzed separately.  *See Dickerson v. McClellan*, 101 F.3d 1151, 1160–61 (6th Cir. 1996).  Therefore, this Court will address each claim in turn.

*Excessive Force Claim*

Plaintiffs' primary claim is that Jose and Mario Calvillo used excessive force against Bryan when they shot and killed him.  An excessive force claim is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395–396 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  While "the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect", *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005), the use of deadly force is permissible if

6

"the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others", *Garner*, 471 U.S. at 11.

The ultimate inquiry in determining whether a violation occurred is whether the totality of the circumstances justifies the force used, taking into account factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Reasonableness must be judged objectively from the perspective of a reasonable officer at the scene, and not with the benefit of hindsight or with regard to the officer's underlying intent or motivation. *Id.* at 396–97. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396. An officer's use of deadly force is only reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Garner*, 471 U.S. 1, 11 (1985).

In the Sixth Circuit, courts use a segmented analysis to determine whether an officer's use of deadly force was reasonable. *See Chappell*, 585 F.3d at 909; *Livermore v. Lubelan*, 476 F.3d 397, 406–07 (6th Cir. 2007); *Dickerson v. McClellan*, 101 F.3d 1151, 1160–61 (6th Cir. 1996). "That is, the court should first identify the 'seizure' at issue here and then examine 'whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances.'" *Livermore*, 476 F.3d at 406 (quoting *Dickerson*, 101 F.3d at 1161).

Plaintiffs argue at considerable length that the actions of Defendants leading up to the

7

shooting were objectively unreasonable and proximately caused Bryan's death. Specifically, Plaintiffs contend Defendants first should have attempted to negotiate with Bryan before entering the Jones' home or alerted him to officers' presence. But that is just the sort of analysis Sixth Circuit precedent directs courts to avoid. *See id.* (noting courts should determine if a seizure was reasonable, "not whether it was reasonable for the police to create the circumstances"). *Dickerson*, which established the segmented analysis approach, was itself a case involving both an alleged illegal entry into the plaintiff's home as well as a claim of excessive force. The court analyzed these claims separately. *Dickerson*, 101 F.3d at 1162 ("[W]e analyze the § 1983 claims separately in this case. Although both claims are premised on Fourth Amendment violations, the violation of the knock and announce rule is conceptually distinct from the excessive force claim.").

The segmented approach was more recently re-affirmed by the Sixth Circuit in *Livermore*, where the court expressly rejected a Ninth Circuit case holding "that a plaintiff's Fourth Amendment claim against police officers who used deadly force may survive summary judgment, even where the particular seizure is reasonable, if the defendant police officers acted recklessly in creating the circumstances which required the use of deadly force." *Livermore*, 476 F.3d at 406 (citing *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002)).

Therefore, this Court believes it must only consider the "totality of the circumstances facing the [officers] at the time they made their split-second judgments immediately prior to using deadly force," *Chappell*, 585 F.3d at 909, rather than all those events leading up to the shooting. When properly analyzed through the segmented approach, it is clear Defendants are entitled to qualified immunity on Plaintiffs' excessive force claim. All the record evidence demonstrates that TRT members believed their lives were in imminent danger immediately before the shooting.

8

Prior to entering the Jones' home, team members were briefed on what they might encounter inside the house. Team members were informed Bryan had threatened to kill his mother earlier, may be "homicidal" or "suicidal", was holding a loaded weapon and may have access to other guns, and had been drinking for two days. (Doc. 39-9, at 6–8). Deputies were also informed Bryan had previously been involved in a drive-by shooting (Doc. 39-9, 16–18, 23, 26, 28, 31, 32), was "acting crazier than heck" (Doc. 39-9, at 6), and was "going to fight" law enforcement officers if they confronted Bryan (Doc. 39-9, at 6).

Deputy Mario Calvillo testified that when he entered the room where Bryan was located, he saw the side of Bryan's shotgun because it was pointed away from the officers. (Doc. 39-5, at 25–26). However, as Calvillo began closing in on Bryan, he saw the shotgun begin to pan toward the team until Calvillo could see down the barrel. (Doc. 39-5, at 26). Because of the direction of the shotgun, Calvillo believed either he or a member of the team was going to be shot. (Doc. 39-5, at 27, 28).

Jose Calvillo's version of the facts is similar. Jose testified that as he entered the room, he identified himself as with the Sheriff's Office and witnessed Bryan's feet move from a rested position on a footrest onto the floor. (Doc. 39-4, at 12). He also saw Bryan tuck the shotgun against his right bicep and move it toward the team. (Doc. 39-4, at 14). As the shotgun moved toward the team, Jose yelled "no" two times; after Bryan did not comply, Jose opened fire. (Doc. 39-4, at 14).

Deputy Kevin Karn's testimony is consistent with that of Deputies Calvillo. Karn testified that as soon as the team entered the room where Bryan was located, Karn saw the barrel of Bryan's shotgun raise six to ten inches. (Doc. 39-7, at 20, 29). Deputy Karn then took cover behind a cabinet. Deputy Karn testified he heard other deputies identify themselves as law enforcement

9

officers and tell Bryan to "put down the gun." (Doc 39-7, at 20). Deputy Karn felt he was in danger when he saw the shotgun barrel come up. (Doc. 39-7, at 29).[2]

Sixth Circuit precedent supports this Court's decision. For instance, in *Bletz v. Gribble*, the plaintiff brought suit on behalf of her deceased husband, who was shot and killed in their home by two police officers. 641 F.3d 743 (6th Cir. 2011). The district court denied the officers qualified immunity, and the Sixth Circuit affirmed because there were differing versions of the facts surrounding the shooting. *Id.* at 752. The defendant police officers testified they used deadly force because the deceased was armed with a shotgun and not responding to the officers' commands to lower his weapon. *Id.* at 748. However, plaintiff's son, who witnessed the shooting, contradicted the officers' version of the facts; he testified his father was lowering his weapon when the officers shot and killed him. *Id.* at 752.

And in *Chappell*, the Sixth Circuit reversed a denial of qualified immunity because there was no genuine issue of material facts surrounding the shooting. The court found it undisputed that officers had probable cause to believe the deceased posed an imminent threat of serious physical harm to the officers. *Chappell*, 585 F.3d at 910. The court stated "[n]one of these facts are disputed by physical or circumstantial evidence and none are disputed by contrary evidence. In fact, there are no other witnesses who could testify to the circumstances facing the detectives in the bedroom immediately before they fired their weapons." *Id.*

The same is true here. Plaintiffs have not pointed to a single piece of evidence genuinely disputing the testimony of Jose Calvillo, Mario Calvillo, or Kevin Karn. Plaintiffs claim there is

---

[2] The testimony of the fourth and final member of the tactical response team, Allen Dorsey, is unhelpful on this point. He testified he only heard, and did not witness, what occurred in the moments preceding the shooting. (Doc. 39-6, at 26).

evidence suggesting the room may have been too smoky from the flash-bang for the deputies to see Bryan's face, but that evidence does not materially contradict the deputies' testimony regarding the direction of the shotgun muzzle. Because it is not genuinely disputed Deputies Mario and Jose Calvillo believed their lives and the lives of the other TRT members were in imminent danger immediately before the shooting, their actions were objectively reasonable, and did not violate Bryan's Fourth Amendment rights.

### *Illegal Entry Claim*

Plaintiffs also claim Defendants violated the Fourth Amendment when Defendants made an unreasonable entry into the Jones' home, which led to Bryan's death. (Doc. 59, at 5). As support, Plaintiffs point out Bryan was alone, either asleep or passed out, unaware of the officers outside the home, completely surrounded, and not threatening anyone at the time. Plaintiffs claim Defendants should have announced their presence prior to entering the Jones' home.

"The Sixth Circuit has long held that 'the fourth amendment forbids the unannounced, forcible entry of a dwelling in the absence of exigent circumstances.'" *Dickerson*, 101 F.3d at 1158 (quoting *United States v. Francis*, 646 F.2d 251, 258 (6th Cir. 1981)). However, the existence of probable cause and exigent circumstances excuse the warrant requirement. *See United States v. Chambers*, 395 F.3d 563, 565 (6th Cir. 2005). Probable cause is defined as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. Defillippo*, 443 U.S. 31, 37 (1979).

There can be no real dispute here there was probable cause to believe Bryan had committed a crime. Tracy Jones called the Sheriff's Office to report Bryan had threatened to kill his mother,

11

and when deputies arrived on scene, Bryan was in possession of a shotgun he was prohibited from possessing due to his status as a convicted felon. *See* R.C. § 2923.13(A)(2).

That leaves this Court to determine "whether an objectively reasonable officer, confronted with similar circumstances, could have reasonably believed that exigent circumstances existed" to justify entry into the Jones' home in the absence of a warrant. *Ewolski*, 287 F.3d at 480. The Fourth Amendment "does not require officers to use the best technique available as long as their method is reasonable under the circumstances." *Dickerson*, 101 F.3d at 1160. And "[e]ven defendants who have in fact violated constitutional rights may be protected if their actions were nevertheless objectively reasonable at the time of the violation." *McCray v. Pittman*, 2010 U.S. Dist. LEXIS 80062, at *24 (E.D. Mich. 2010) (citing *Davis v. Scherer*, 468 U.S. 183, 190 (1984)); *see also O'Brien v. City of Grand Rapids*, 23 F.3d 990, 1000 (6th Cir. 1994) (concluding that "it is clear that the officers were not, in law, excused on exigent circumstance grounds from obtaining a warrant before invading O'Brien's house. But we cannot say that no reasonable officer . . . could conclude that there were exigent circumstances excusing the requirement that a warrant be obtained").

The Sixth Circuit has noted that the presence of a weapon in a home can give rise to an exigency justifying entry:

> The presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent. Evidence that firearms are within a residence, by itself, is not sufficient to create an exigency to officers when executing a warrant. However, threats to an officer's safety, a criminal record reflecting violent tendencies, or a verified reputation of a suspect's violent nature can be enough to provide law enforcement officers with justification to forego the necessity of knocking and announcing their presence.

*United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996) (internal citations omitted).

Here, exigent circumstances justified the deputies' entrance into the Jones' home. At the

time of the entry, deputies either knew or believed the following: Bryan possessed a firearm, he was homicidal and/or suicidal, had threatened to kill his mother, was "willing to fight" with officers if confronted (Doc. 39-9, at 6–8), and Deputies knew Bryan had a history of violent behavior, having spent time in prison for his involvement in a drive-by shooting (Doc. 39-9, 16–18, 23, 26, 28, 31, 32). Furthermore, deputies witnessed Bryan in possession of a firearm he was not by law permitted to possess. It was necessary for officers to attempt to extract Bryan from the home to protect others from possible future confrontations.

Plaintiffs' rely on *Rush v. City of Mansfield*, 771 F. Supp. 2d 827 (N.D. Ohio 2011), for the proposition that Bryan's death was proximately caused, and therefore compensable, by Defendants' unreasonable entry into the Jones' home. This reliance, however, is misplaced. In *Rush*, the City's S.W.A.T.-equivalent executed a search warrant on the plaintiffs' home at approximately 11:00 p.m. to search for "evidence of a teenage girl's involvement in a theft ring . . . of low-cost items shoplifted from a commercial establishment." *Id.* at 848, 868. When the team arrived, all the lights in the home were off and all occupants appeared to be sleeping. *Id.* at 850.

One officer threw a flash-bang into the air while other officers simultaneously began shouting police and banging on the door. *Id.* Team members pointed their assault weapons at the windows of the house, although these were equipped with extremely bright lights that prevented residents from making a visual identification of the police. *Id.* From inside the house, the residents could not hear that it was the police—they merely heard "banging and yelling." *Id.*

As that occurred, Gilbert Rush appeared at a window holding his shotgun. *Id.* A sheriff's deputy then shot at Rush, who returned fire. Police entered the plaintiffs' kitchen, where they found Rush, seated on the floor and bleeding, with his shotgun pointed toward the officers. The officers

opened fire, killing Rush. *Id.*

Plaintiffs brought suit, challenging the use of the tactical team and the team's failure to reasonably knock-and-announce its presence prior to entry. The court denied summary judgment for the officers, stating a reasonable jury could conclude the entry was unreasonable and the officers failed to adequately knock-and-announce their presence prior to entry. *Id.* at 859, 870.

The officers in *Rush*, unlike here, were not faced with exigencies negating the knock-and-announce requirement. The circumstances under which these Defendants were operating were much different than those in *Rush*. Here, the TRT was faced with a person they knew to be armed, who had earlier threatened his mother's life, and had a history of violence. By waking Bryan, officers may have escalated the situation. In other words, given the circumstances, it was not unreasonable for Defendants to proceed as they did, without announcing their presence prior to entry.

Furthermore, even if an exigency did not truly exist, Defendants would still be entitled to qualified immunity because their actions were objectively reasonable. *See O'Brien*, 23 F.3d at 1000. Given what Defendants believed about Bryan at the time—his previous record, his homicidal or suicidal thoughts, his possession of a loaded shotgun, and his violent threat—it was reasonable for Defendants to believe an exigency existed. And even if some of these assumptions were wrong, the qualified immunity inquiry is conducted from the perspective of the officers at the time of the alleged violation, not in hindsight. *Graham*, 490 U.S. at 396. Even if, as in *O'Brien*, exigent circumstances and probable cause were not in fact present, the evidence here supports at least a reasonable belief on the part of Defendants that their warrantless entry was justified.

**Claims Against Sheriff Overmyer**

Plaintiffs assert Sheriff Overmyer, who headed the Tactical Response Team, is liable individually for his role in the use of force against Bryan. Plaintiffs argue Sheriff Overmyer, by failing to pursue other methods or strategies to contact Bryan, created the circumstances that led to Bryan's death.

Although other circuits have recognized liability on the part of an officer who recklessly created the circumstances requiring the use of deadly force, *see, e.g.*, *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), the Sixth Circuit has explicitly rejected such claims, *see Livermore*, 476 F.3d at 406; *see also Dickerson*, 101 F.3d at 1161 (stating courts must first identify the seizure at issue and then determine "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances").

Again applying the segmented analysis, as this Court must, Sheriff Overmyer is entitled to summary judgment on Plaintiffs' claims. The seizure Plaintiffs identify as leading to Sheriff Overmyer's liability is the shooting. (Doc. 41, at 37). However, Sheriff Overmyer did not take part in the shooting; all of his actions took place before entry into the Jones' home and, under *Dickerson,* are therefore immaterial to a Fourth Amendment claim. Furthermore, as discussed above, Deputies Jose and Mario Calvillo did not violate the Fourth Amendment when they shot and killed Bryan because their actions were objectively reasonable under the circumstances. Therefore, Sheriff Overmyer cannot be held liable for these claims either.

**Municipal Liability**

Plaintiffs also claim Sandusky County is liable for the force used against Bryan under several theories, including the County's failure to adequately train the Tactical Response Team, its failure to adequately discipline Jose Calvillo, and its failure to adequately fund the Sheriff's Office.

15

Defendants counter that all these claims are beside the point because Plaintiffs cannot demonstrate a constitutional violation in the first instance.

To succeed on their municipal liability claim, Plaintiffs must demonstrate both (1) a constitutional deprivation (2) that was caused by the County. *Doe v. Claiborne County*, 103 F.3d 495, 505–06 (6th Cir. 1996). However, Plaintiffs cannot rely on the actions of an employee to impose liability on the County; rather, they must demonstrate the County itself is the wrongdoer. *Id.* at 507. To prevail, Plaintiffs must show Bryan's death was caused by an official custom or policy of the County. *Id.* (citing *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978)).

A failure to train claim can also form the basis of a § 1983 claim, but only "where the failure to train amounts to deliberate indifference to the rights of the person with whom the police come into contact." *Whitlow v. City of Louisville*, 39 F. App'x 297, 302 (6th Cir. 2002) (quoting *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). "Deliberate difference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. A showing of simple or even heightened negligence will not suffice." *Whitlow*, 39 F. App'x at 302 (internal citations and quotations omitted).

But the Court need not address the County's policies or customs because Plaintiffs' municipal liability claims fail for the same reasons their claims against the individual Defendants fail: there has been no constitutional violation. As discussed above, both the entry into the Jones' home and Bryan's shooting were objectively reasonable and therefore did not violate the Fourth Amendment. A finding "that no officer-defendant had deprived the plaintiff of any constitutional right *a fortiori* defeats the claim against the County as well." *Scott v. Clay County*, 205 F.3d 867,

879 (6th Cir. 2000); *see also Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

**State Law Claims**

Plaintiffs also allege state law claims against Defendants for wrongful death (Count III), gross negligence (Count V), reckless conduct (Count VI), and intentional infliction of emotional distress (Count VIII). Plaintiffs claim Defendants acted in a "reckless and wanton manner when they disregarded a known risk of undertaking entry into the Jones home when the circumstances did not warrant that action." (Doc. 52, at 34). Defendants counter that they are entitled to immunity under R.C. § 2744.03(A) (for the individuals) and R.C. § 2744.02(A) (for the County).

*The Deputies and Sheriff Overmyer*

"[E]mployees of a political subdivision are immune from liability pursuant to R.C. 2744.03(A)(6) unless the employee's acts or omissions 'were with malicious purpose, in bad faith, or in a wanton or reckless manner.'" *Cook v. City of Cincinnati*, 103 Ohio App. 3d 80, 90 (Ohio Ct. App. 1995). Because the Ohio legislature has established a law enforcement officer cannot be held liable for acts committed while carrying out his official duties unless one of the exceptions applies, courts start from a presumption of immunity. *Id.*

"'Malice' is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Id.* (citing *Jackson v. Butler Cty. Bd. of Commrs.*, 76 Ohio App. 3d 448 (Ohio Ct. App. 1991)). "'Bad faith involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive

17

or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Id.* And "wanton misconduct is the failure to exercise any care whatsoever"; however, "mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor." *Id.* (quoting *Fabrey v. McDonald Police Dept.*, 70 Ohio St. 3d 351, 356 (1994)). "Such perversity must be under such conditions that the actor must be conscious that his conduct will, in all likelihood, result in an injury." *Id.*

For the reasons stated earlier, Plaintiffs have failed to show that Defendants' actions were objectively unreasonable, and therefore it follows they have also failed to show Defendants acted with the more culpable mental states of malice, bad faith, or recklessness. *Chappell*, 585 F.3d at 916 n.3 (citing *Ewolski*, 287 F.3d at 517). Accordingly, the Deputies and Sheriff Overmyer are entitled to official immunity under R.C. § 2744.03.

### *The County*

While the County normally enjoys immunity for the acts or omissions of the county or its employees "in connection with a governmental or proprietary function", R.C. § 2744.02(A)(1), immunity does not apply here because Plaintiffs' claims are "based upon alleged violations of the constitution or statutes of the United States", R.C. § 2744.09(E). However, as explained throughout this R&R, Defendants did not violate Bryan's Fourth Amendment rights, nor did they act with malice, in bad faith, or in a reckless and wanton manner. Plaintiffs offer no other reason to impose liability upon the County and the Court can find none. Accordingly, Plaintiffs' state law claims against the County should also be dismissed.

## CONCLUSION AND RECOMMENDATION

What occurred here is no doubt tragic, and with the benefit of hindsight, perhaps everyone

18

involved would have acted differently to minimize confrontation. But hindsight is not the lense through which this Court must view this case. The undisputed facts establish that the actions taken by the Defendants were not objectively unreasonable, and therefore the undersigned recommends denying Plaintiffs' Motion for Partial Summary Judgment (Doc. 41) and granting Defendants' Motion for Summary Judgment (Doc. 39-1).

s/James R. Knepp II<br>
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).