IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Tracy Jones, et al.,                              Case No. 3:10 CV 2261

                    Plaintiffs,              MEMORANDUM OPINION
                                             AND ORDER

          -vs-
                                             JUDGE JACK ZOUHARY
Sandusky County, Ohio, et al.,

                    Defendants.


**INTRODUCTION**

This case arises from the tragic shooting and killing of Bryan Jones by members of the Sandusky County Sheriff's Department.  Bryan's parents, Tracy and Kim Jones ("Plaintiffs"), bring suit as administrators of Bryan's estate against deputies Mario and Jose Calvillo, as well as Sheriff Kyle Overmyer and Sandusky County ("Defendants"), alleging, pursuant to 42 U.S.C. § 1983, the use of excessive force in violation of the Fourth Amendment.  Plaintiffs also allege state law claims against Defendants for wrongful death, gross negligence, reckless conduct, and intentional infliction of emotional distress.

The parties filed cross-Motions for Summary Judgment (Doc. Nos. 39 and 41), and the matter was fully briefed (Doc. Nos. 50, 52, 57 and 59).  Pursuant to Local Rule 72.2(b)(2), this case was referred to Magistrate Judge Knepp for a Report and Recommendation ("R&R").  After extensive briefing by both parties, and after conducting a record hearing, the Magistrate recommended this Court deny Plaintiffs' Motion for Partial Summary Judgment and grant Defendants' Motion for Summary Judgment (Doc. No. 64).

The matter is now before this Court on Plaintiffs' Objections to the R&R (Doc. No. 66). Defendants filed a response (Doc. No. 68). This Court held a hearing as well, where the parties responded to questions orally and in writing (Doc. Nos. 75–78). In accordance with *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981) and 28 U.S.C. § 636(b)(1)(B) & (C), this Court has reviewed *de novo* the determination of the Magistrate.

**BACKGROUND**

On the night of July 11, 2010, Tracy Jones was preparing to leave his family residence for work when he had an argument with his son Bryan. Bryan told Tracy: "Your old lady's dead, click, click" (Doc. No. 41-2 at 16). Bryan's comment upset Tracy, who responded by telling Bryan to get out of the house. Bryan told Tracy he had a gun and challenged him to "go ahead and call the police, call them in front of me" (Doc. No. 41-2 at 16). Tracy left and went to the home of his other son, who lived approximately a half-mile away, where Tracy called 9-1-1 and told the dispatcher Bryan threatened to kill his mother, Kim Jones. The call was placed shortly after 9:45 p.m. Tracy also informed the dispatcher Bryan had a loaded gun, was acting "crazier than heck," had been drinking for two days, and would fight if the police arrived (Doc. No. 39-9 at 2–7). Tracy repeated he wanted Bryan "gone" and out of the house (Doc. No. 39-9 at 2 and 5).

The dispatcher notified deputies, informing them Bryan was "going to kill everybody and himself" -- even though Bryan never threatened to kill himself (Doc. No. 39-9 at 7–8). The dispatcher and the deputies are employees of Sandusky County under the direct supervision of Sheriff Kyle Overmyer (Doc. No. 41-5 at 26).

Deputies arrived at the Jones' home shortly after 10:00 p.m., and by peering into the living room window, found Bryan seated with his feet propped up on a coffee table and a shotgun laying across his lap. Bryan's eyes were closed, but he occasionally half-opened them and moved around

2

(Doc. No. 39-6 at 15).  One of the deputies requested the dispatcher make telephone contact with Bryan.  The dispatcher attempted one call, which went unanswered after numerous rings (Doc. No. 28 at 40).  Neither the dispatcher nor the deputies made further efforts to contact Bryan.

Sheriff Overmyer was also alerted and called to the scene.  While en route, Sheriff Overmyer recalled, and confirmed with dispatch, Bryan was previously involved in a drive-by shooting (Doc. No. 39-9 at 17–18).  Upon his arrival, Sheriff Overmyer decided to activate the Tactical Response Team ("TRT") -- Sandusky County's equivalent of a SWAT team.  The members of the TRT available on that night were deputies Jose Calvillo ("Jose"), Mario Calvillo ("Mario"), Kevin Karn ("Kevin"), and Allen Dorsey ("Allen") (Doc. No. 39-9 at 37–39).

The deputies observed Bryan through the window for approximately an hour and a half.  Over this time, Bryan made few movements, none of which were threatening.  The parties dispute Bryan's state of consciousness -- Plaintiffs claim he was asleep or passed out, while Defendants contend he might have been feigning sleep and planning an ambush on the deputies.  Defendants also argue Sheriff Overmyer was concerned Bryan may have overdosed or caused injury to himself (Doc. No. 68 at 19).  For these reasons, the TRT decided to apprehend Bryan by making a forcible "dynamic entry" into the home.  Sheriff Overmyer explicitly authorized this action (Doc. No. 41-8 at 26).

To aid in the TRT's entry, Tracy Jones was called to the scene.  Tracy explained the layout of his home and informed TRT members the back door was unlocked (Doc. No. 41-2 at 19).  Tracy never expressly objected to the entry plan, but did ask permission to first enter the home to retrieve Bryan.  This was denied.  Instead, Tracy was placed in the care of an Ohio State Trooper, who took him approximately 45 yards away (Doc. No. 41-2 at 20).  Sheriff Overmyer and TRT leader Jose devised the TRT's entry plan -- a backdoor entry, detonating a diversionary flashbang device, and apprehending Bryan.

3

At approximately 11:30 p.m., TRT member Allen opened the back door, allowing the three other TRT members to enter the home and make their way into the kitchen.  The kitchen adjoined the living room where Bryan was seated (Doc. No. 39-6 at 22–24).  Allen stayed behind.  TRT member Kevin peaked around the corner and threw a flashbang, detonating as expected, in the living room (Doc. No. 39-7 at 16).  Members of the TRT rushed forward, repeatedly identifying themselves as Sheriff's deputies and yelling at Bryan to put down the gun (Doc. Nos. 39-4 at 13; 39-7 at 20).

According to these three deputies, Bryan did not put down his gun.  Kevin stated he saw the barrel of Bryan's shotgun "go up" to a position pointed towards the TRT (Doc. 39-7 at 20).  He took cover behind a cabinet.  Similarly, Mario saw the muzzle of Bryan's shotgun move towards the TRT's general direction until he was looking down the barrel of the gun.  Mario was convinced Bryan was going to fire, testifying there was "no doubt" in his mind (Doc. No. 39-5 at 9).  Jose saw the same movement, and yelled at Bryan to stop.  According to Jose, Bryan stocked the shotgun under his right biceps and pointed it at the TRT (Doc. 39-4 at 13–14).  All TRT members felt Bryan intended to shoot (Doc. Nos. 39-4 at 14; 39-5 at 9; 39-7 at 21–22).  In response, both Jose and Mario opened fire, killing Bryan.

## DISCUSSION

### Standard of Review

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec.*

4

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  This Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, this Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

Moreover, the fact both parties have filed cross-Motions for Summary Judgment "does not mean that the court must grant judgment as a matter of law for one side or the other."  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).  Because summary judgment in favor of either party is not proper if disputes remain as to material facts, this Court must evaluate each party's Motion on its own merits.  *Id.*

### Section 1983 and Qualified Immunity

Plaintiffs allege Defendants made a warrantless entry into their home and used excessive force in violation of the Fourth Amendment when they shot and killed Bryan.  These claims arise under 42 U.S.C. § 1983, which creates a civil cause of action against individuals who, while acting under color of state law, deprive a person of the "rights, privileges or immunities secured by the Constitution or laws of the United States."  *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005).  It is undisputed Defendants were acting "under color of state law."

The Fourth Amendment, applicable to the states by "incorporation" through the Fourteenth Amendment, protects citizens against "unreasonable searches and seizures."  *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994); *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011).  Here, Plaintiffs allege two separate Fourth Amendment violations.  First, Plaintiffs claim Defendants violated their right against unreasonable searches and seizures by making an illegal entry into their home.  Second, Plaintiffs allege excessive force, arguing Defendants Jose and Mario applied "objectively unreasonable" force leading to Bryan's death.

Defendants contend the claim of illegal or warrantless entry was not pled in the Complaint or briefed by the parties at the summary judgment stage.  And, because Plaintiffs raised this claim for the first time in their Reply in support for summary judgment, it should not be "belatedly considered" (Doc. No. 68 at 2).  As support, Defendants direct this Court to *Scottsdale Ins. v. Flowers*, where the Sixth Circuit held a claim was not preserved for appeal because the defendant raised the issue for the first time in her reply in support of her motion to alter, amend or reconsider the district court's judgment. 513 F.3d 546, 552–54 (6th Cir. 2008). However, that case is unpersuasive for two reasons.

First, *Scottsdale's* rationale was based on preserving issues for appeal.  *Id.* at 553.  This is not an appeal.  Second, the court's decision was also based on "fairness and procedure" -- the plaintiff was never afforded a response to the reply and was "unfairly prevented . . . from presenting a counter-argument to the court."  *Id.*  Here, that is not the case.  Defendants were given the opportunity to respond to Plaintiffs' illegal entry claim at the December 2011 oral argument, and in their Response to Plaintiffs' Objections to the R&R.  Indeed, Defendants spent a considerable portion of their Response addressing the issue (Doc. No. 68 at 4–18).  Waiver is inappropriate when a new issue is fully briefed and then addressed by a court.  *See, e.g.*, *Lexicon, Inc. v. Safeco Ins. Co. of Am.*, 436 F.3d 662, 670 n.6 (6th Cir. 2006).  Therefore, this Court will address Plaintiffs' illegal entry claim.

### *Qualified Immunity Framework*

Section 1983 claims are subject to the affirmative defense of qualified immunity which, if applicable, shields individuals not just against liability, but against the suit itself.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity protects state officials so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine balances two important interests --

6

the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231.

Qualified immunity applies unless it is obvious no reasonably competent official would have concluded the actions taken were unlawful. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). In fact, qualified immunity was designed to give "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotations omitted). The accommodation for reasonable error exists because officials should not always err on the side of caution due to the fear of being sued. *Id.* The protection of the doctrine applies whether the official's error is a mistake of law, fact, or mixed questions of law or fact. *Pearson*, 555 U.S. at 231.

Plaintiffs bear the burden of showing Defendants are not entitled to qualified immunity. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). The "objective legal reasonableness" standard under this framework rests on a fact-specific, case-by-case determination, of whether a reasonable official in Defendants' position "could have believed [their] conduct was lawful, judged from the perspective of the reasonable official on the scene." *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987)). To this end, the Sixth Circuit mandates a two-step sequence for resolving qualified immunity claims: (1) whether the facts, viewed in the light most favorable to Plaintiffs, show a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of Defendants' alleged misconduct. *Id.* With regards to the second step, Plaintiffs must show the right was "clearly established" in this particular context -- that is, a reasonable officer confronted with the same situation would have known using deadly force would violate that right. *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004).

7

### *Fourth Amendment Claims*

Under the first step, if the facts do not rise to the level of a constitutional violation, then qualified immunity applies. *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).  Conversely, if the question of immunity is "completely dependent upon which view of the facts is accepted by the jury," this Court should not grant immunity. *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989).

Here, as noted above, Plaintiffs claim qualified immunity does not apply and assert two separate Fourth Amendment violations.  Although both violations arise out of the same series of events, the Sixth Circuit applies a "segmented approach" to the Fourth Amendment and analyzes illegal entry claims separately from excessive force claims.  *See Dickerson*, 101 F.3d at 1162.  Therefore, in determining whether Plaintiffs have met their burden under the qualified immunity framework, this Court must analyze their claims separately.  *Id.*

### <u>*Illegal Entry Claim*</u>

Plaintiffs allege Defendants violated the Fourth Amendment by unreasonably entering their home.  The Fourth Amendment protects "the right of the people to be secure in their houses, papers, and effects, against unreasonable searches and seizures."  A search or entry conducted without a warrant issued upon probable cause is *per se* unreasonable, "subject only to a few specifically established and well-delineated exceptions."  *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2011) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). The "well-delineated" exception at issue in this case is consent.

A warrantless entry or search does not violate the Fourth Amendment so long as an officer obtains consent.  *Moon*, 513 F.3d at 537; *Davis v. United States*, 328 U.S. 582, 593–94 (1946).  Such consent, however, must be "voluntary and freely given."  *Moon*, 513 F.3d at 537 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).  "Consent is voluntary when it is unequivocal, specific,

8

and intelligently given, uncontaminated by any duress or coercion." *Id.* (quotations omitted).  The standard for measuring the scope of consent is that of "objective reasonableness" -- that is, what a reasonable person would have understood by the exchange between the officer and the individual giving consent. *United States v. Lucas*, 640 F.3d 168, 175 (6th Cir. 2011); *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

There can be no doubt Plaintiffs consented to Defendants' entry of their home.  Tracy Jones, as owner of the home, had authority to consent and did consent.  During a phone call to the law enforcement dispatcher, Tracy stated (Doc. No. 39-9 at 2–5):

> [Bryan] threatened to kill my wife.  He has a loaded gun.  He's acting crazier than heck.  He's at my house by himself.  I want him out of there.
>
> *   *   *
>
> He's been drinking for two days.
>
> *   *   *
>
> I'm tired of his crap.  And he goes, "Your old lady is dead.  I'm going to, you know, Click, Click."  And I'm not taking that from him, you know.  I want him gone.
>
> *   *   *
>
> I think -- I don't know what he's trying to do because he's already said if I call the cops on him, he's going to fight --

It is clear from this record Tracy called law enforcement, informed them Bryan was armed and made threats, was in Tracy's home alone, and Tracy wanted Bryan out.  A reasonable person would have understood this exchange as giving Defendants consent to enter and remove Bryan.  *See Lucas*, 640 F.3d at 175.  There is no allegation Tracy's consent was involuntary or was obtained by duress or coercion.

Furthermore, Tracy's consent was never withdrawn.  Tracy was with deputies staked outside his home as they discussed and planned to remove Bryan.  While Tracy offered to "go in and get

9

Bryan" himself, this last-minute request to help was not a withdrawal of consent. Since Bryan was armed and previously made threatening remarks towards his family, Tracy was not allowed to enter (Doc. No. 41-2 at 20). Tracy never protested Defendants' entry.

Plaintiffs point out that Tracy told a member of the TRT "Don't go in there and shoot him" (Doc. No. 41-2 at 20). However, a reasonable person would not have understood this statement as the withdrawal of consent. Rather, Tracy's statement was a plea for Bryan's safety -- an expression of concern in light of the serious situation. Indeed, Tracy reaffirmed his earlier consent by providing officers details about the layout of the home, including the unlocked kitchen door used to enter the home (Doc. No. 41-2 at 19–20). Moreover, Tracy testified he trusted the Sandusky County Sheriff, admitting he did not recall objecting to the home invasion (Doc. No. 41-2 at 20).

Tracy's conduct was consistent with his verbal grant of consent -- that is, under the objective reasonableness standard, Tracy did not make statements challenging Defendants' authority to enter his home to remove Bryan. *See, e.g.*, *United States v. Lopez-Mendoza*, 601 F.3d 861, 867 (8th Cir. 2010) (holding conduct withdrawing consent must be "clearly inconsistent with the apparent consent," "an unambiguous statement challenging the officer's authority to conduct the search," or both). The fact Tracy was placed in the care of an Ohio State Trooper, who took Tracy away from the home at a safe distance, does not change the result (Doc. No. 41-2 at 20). Nothing Tracy said or did could reasonably construed as withdrawal of consent.[1]

---

[1]

Even if Tracy withdrew consent, Defendants are excused from their unannounced entry of Plaintiffs' home because of probable cause and exigent circumstances. *See United States v. Chambers*, 395 F.3d 563, 565 (6th Cir. 2005). As the Magistrate noted, there can be no dispute Defendants had probable cause to believe Bryan had committed a crime -- Tracy reported to the police Bryan had threatened to kill his mother, and when the officers arrived on the scene, Bryan was in possession of a shotgun he was prohibited from possessing due to his status as a convicted felon. *See* R.C. § 2923.13(A)(2). Furthermore, under Sixth Circuit precedent, "[t]he presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent." *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996). "[T]hreats to an officer's safety, a criminal record reflecting

10

Accordingly, Defendants did not violate Plaintiffs' Fourth Amendment rights by illegally entering their home.  Because no constitutional violation occurred, Plaintiffs' Section 1983 claims cannot be predicated on the warrantless entry. *Cochran*, 656 F.3d at 306.

### *Excessive Force Claim*

Plaintiffs also allege Jose and Mario used excessive force against Bryan when they shot and killed him.  Individuals have a constitutional right not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure."  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Id.* at 395.  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  While officers are not permitted to use deadly force in seizing an unarmed, non-dangerous suspect, *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005), they may use such force if probable cause exists to believe "the suspect poses a threat of serious physical harm, either to the officer or to others."  *Garner*, 471 U.S. at 11.

Furthermore, the reasonableness of a particular use of force must be objectively judged from the perspective of a reasonable officer on the scene -- not with the benefit of hindsight or with regard to the officer's underlying intent or motivation.  *Graham*, 490 U.S. at 396–97.  Indeed, it is not for this Court to substitute its own notion of the "proper police procedure for the instantaneous decision of the officer at the scene."  *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000).  "The calculus of

violent tendencies, or a verified reputation of a suspect's violent nature can be enough to provide law enforcement with justification to forego the necessity of knocking and announcing their presence." *Id.* Here, exigent circumstances justified Defendants' entry.  At the time of their entry, Defendants knew or believed Bryan was homicidal and/or suicidal, threatened to kill his mother, was "willing to fight" with officers if confronted, and Bryan had a history of violent behavior, having served a prison sentence for his involvement in a drive-by shooting.  Defendants also saw Bryan holding a firearm.  For these reasons, exigent circumstances excused an unannounced entry.

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* Also, when there are multiple uses of force, the appropriate method of analysis is to "carve up" the incidents "into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Dickerson*, 101 F.3d at 1161 (quotation omitted); *see also Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir. 1992) (analyzing three distinct excessive force claims separately even though they were part of one incident).

Whether events leading up to a shooting are legitimate factors to consider in assessing excessive force claims depends on the totality of the circumstances. *Bletz v. Gribble*, 641 F.3d 743, 7521 (6th Cir. 2011). As discussed above, the Sixth Circuit analyzes excessive force claims in segments by "first identify[ing] the seizure at issue . . . and then examin[ing] whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Id.* (quotation omitted). "[I]t is the reasonableness of the 'seizure' that is the issue, not the reasonableness of the [police officer's] conduct in time segments leading up to the seizure." *Id.* In other words, the Sixth Circuit separates actions of police officers occurring in the hours leading up to the use of force, from the "split-second judgments made immediately before the officer used allegedly excessive force." *Bletz*, 641 F.3d at 751–52; *see also Dickerson*, 101 F.3d at 1162 (holding the inquiry in excessive force claims is limited to "the moments preceding" the actual use of force); *Chappell*, 585 F.3d at 909 (holding the conduct of officers leading up to actual confrontation with a suspect is immaterial).

Plaintiffs argue Defendants' conduct preceding the shooting is relevant to the objective reasonableness of the force used against Bryan. Specifically, Plaintiffs argue it would "make little sense" to ignore the events leading up to Bryan's shooting, which occurred over the course of an hour

12

and a half (Doc. No. 66 at 26), and that Defendants failed to make "reasonable attempts to use alternate methods of communication with Bryan before confronting him" (Doc. No. 41 at 39). Plaintiffs point to Defendants' TRT Manual, which states dynamic forced entries should only be used as a last resort -- when "negotiations have failed and chemical munitions have not been effective in forcing a surrender" (Doc. No. 30-1 at 59).

As the Magistrate correctly noted, Plaintiffs' desired approach runs afoul of the Sixth Circuit's segmented analysis approach. The objective reasonableness test for excessive use of force requires this Court to focus on the moment the deputies made "split-second judgments," not on the preceding events leading up to the use of force. Therefore, this Court must disregard the events leading up to the use of force against Bryan and focus instead on the judgment made "immediately before [Defendants] used allegedly excessive force." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007).

This Court's first task under the segmented approach is to identify "the seizure at issue." *Bletz*, 641 F.3d at 752. Here, the seizure at issue was the apprehension of Bryan. The second task is to determine whether, under the Fourth Amendment's "objective reasonableness" standard, "the force used to effect the seizure was reasonable in the totality of the circumstances." *Id.* This case involves two separate uses of force against Bryan. First, Defendants used a flashbang device in entering the home. *See Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555, 569 (6th Cir. 2006) (recognizing flashbang devices as use of force). Second, after the detonation of the flashbang device, and after observing Bryan point a shotgun towards the TRT, Defendants Jose and Mario opened fire, killing Bryan.

1.      *Use of a Flashbang Device*

Shortly after arriving at the scene, Sheriff Overmyer made the decision to call in the TRT. Defendants' plan to enter the home was devised with input from various officers on the scene (Doc. No. 41-8 at 25).  Defendant Jose, as the TRT leader, made the final call, with Sheriff Overmyer's approval, for a flashbang entry (Doc. No. 41-8 at 25–26).   Because the "time-frame is a crucial aspect" under a segmented analysis, this Court analyzes whether the use of a flashbang to effect Bryan's seizure was reasonable at the moment the TRT determined to make a "dynamic" entry. *Bletz*, 641 F.3d at 751–52.

The Sixth Circuit has long held summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of force.  *See Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998).  Indeed, when reasonableness is "completely dependent upon which view of the facts is accepted by the jury," district courts, viewing the facts most favorably to Plaintiffs, cannot grant immunity.  *Id.* (citing *Brandenburg v. Cuerton*, 882 F.2d 211, 215–16 (6th Cir. 1989)).  The reasonableness of the use of force is the linchpin of this case -- if a jury determines Defendants' actions in detonating a flashbang device were unreasonable, their conduct is actionable under the Fourth Amendment.  *Id.*  On the other hand, if the jury finds Defendants' conduct reasonable, qualified immunity will shield them from liability.  *Id.*  In other words, where, as here, "the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability."  *Id.*; *see also Buckner v. Kilgore*, 36 F.3d 536, 540 (6th Cir. 1994).

According to Plaintiffs, Bryan was either asleep or passed out when the flashbang device went off (Doc. No. 41 at 12).  Defendants, however, argue Bryan might have been feigning sleep and was actually "planning an ambush to provoke an attack or suicide by cop" (Doc. No. 68 at 12).  While

14

Defendants admit Bryan may have been sleeping, they contend he was "holding a gun in his lap pointed toward the road," had his hand on the trigger, and occasionally half-opened his eyes and moved his head (Doc. No. 68 at 10–11).  Defendants argue this behavior is "utterly inconsistent with the purely innocent behavior of one whose only intent is to sleep" (Doc. No. 68 at 10).

Was Bryan incapacitated inside his home -- alone -- and not posing an immediate threat to officers or anyone else?  Because Defendants detonated a flashbang device instead of undertaking alternative efforts to resolve Tracy's call for help, their use of force could be held unreasonable.  *See Dickerson*, 101 F.3d at1160 (recognizing that while the Fourth Amendment does not require officers to use the best techniques available, their methods must be "reasonable under the circumstances").  This conclusion is supported by Defendants' own admission that the entry was made partly out of concern for Bryan's safety.  According to Defendants, Sheriff Overmyer became concerned Bryan "overdosed or harmed himself" once he became motionless (Doc. No. 68 at 11).  If true, a jury could conclude that coming to Bryan's aid by detonating a flashbang was unreasonable.

Likewise, there is a genuine issue of material fact whether Defendants considered the alternative directives expressly laid out in their TRT Manual.  Plaintiffs argue the "carefully prepared" TRT Manual lists various courses of action Defendants ignored by entering Bryan's home and detonating the flashbang (Doc. No. 66 at 8).  Plaintiffs correctly note the Manual specifically states forced entries into residences are appropriate only as a "last resort" (Doc. No. 30-1 at 59).  Defendants disagree -- they contend the TRT's actions "were consistent with the Manual" (Doc. No. 68 at 13).  The Manual states the "basis of the team is to try to get a tactical advantage over the perpetrator" (Doc. No. 30-1 at 59) and Defendants argue the tactical advantage necessary in this case was the "element of surprise."  The Manual explains "[s]urprise is extremely important as is the fast execution of the operation in order to present the minimum danger to the officers performing the operation . . .

15

Thought should be given to diversionary tactics such as loud noises in an area away from the point of entry." (Doc. No. 30-1 at 60).

A genuine factual dispute exists whether Defendants' actions were consistent with their own Manual, a relevant consideration in determining the reasonableness of the steps taken to seize Bryan. The Manual warns dynamic entries should be used as a last resort, after "negotiations and chemical munitions" fail in forcing a surrender (Doc. No. 30-1 at 59). The Manual says more, generally advising use of dynamic entries only when the suspect is both armed and "barricaded or with hostages" (Doc. No. 30-1 at 59). Bryan had no hostages and was not barricaded -- he was in open view through the window. Moreover, when a dynamic entry is made, "the safe extraction of the suspect becomes highly unlikely" (Doc. No. 30-1 at 59). In other words, a jury could determine a reasonable officer would have known the use of a flashbang to enter the home was an unreasonable use of force.

### 2. *Use of Deadly Force*

Shortly after detonation of the flashbang, Defendants argue Bryan refused to drop his weapon and instead pointed it at TRT members. This caused Defendants Jose and Mario to open fire on Bryan. Because this act of force was separate from the use of the flashbang, this Court must judge its reasonableness on its own terms. However, as Defendants note, the fact officers may have created the confrontation leading to Bryan's death is of no concern. *See Dickenson*, 101 F.3d at 1160–61. Rather, this Court must look at "the moments preceding the shooting" and examine the totality of the circumstances in determining whether the "particular type of force used was reasonable." *Id.* at 1161–62.

The facts surrounding Bryan's death are strikingly similar to those in *Whitlow v. City of Louiseville*, where police used a flashbang prior to fatally shooting an armed suspect who pointed a

gun at an officer after being instructed to drop it.  39 Fed. App'x 297, 300 (6th Cir. 2002).  The *Whitlow* court noted that only a "matter of seconds" elapsed from the time the police entered the suspect's home, detonated the flashbang, ordered the suspect to drop his weapon, and the time the officers killed the suspect in response to what they perceived as a threat.  *Id.* at 306.  Because of the short time period, the Sixth Circuit concluded "all the facts that occurred during that time [were] relevant to the reasonableness inquiry."  *Id.*

The deadly force in *Whitlow* was reasonable under the circumstances because the police identified themselves prior to engaging the suspect, and because there was no evidence the flashbang distracted the suspect such that he was unable to hear or understand the officers' repeated shouts of "police" and "search warrant."  *Id.* at 307.  The "only reasonable inference" was that the officer acted in self-defense in firing at the suspect when the suspect pointed his gun at him after being ordered to drop it.  *Id.* at 306.

Like *Whitlow*, the events that took place between Defendants' entry into Bryan's home and the shooting occurred in a "matter of seconds."  In fact, once Defendants entered the residence, less than ten seconds elapsed before Bryan was shot (Hearing at 16) (agreeing the events occurred in "a very short period of time," within "10 seconds or less").  This is supported by Kim Jones' testimony, who was near the scene and "heard the bang and boom, boom, boom, boom, boom, boom *immediately*" (Doc. No. 41-3 at 18–19) (emphasis added).  Likewise, Tracy Jones heard "bangs," meaning "both bangs of gunshots and flashing banging" (Doc. No. 34-1 at 98).  Because of this brief time period, all the facts after Defendants' entry -- those few seconds preceding the shooting -- are relevant to the reasonableness inquiry under *Dickerson* and its progeny.  *Id.* at 306.

According to Defendants, it is "undisputed" Bryan "pointed a gun in the direction of the deputies, entitling them to respond with deadly force" (Doc. No. 68 at 32).  All TRT members

testified they saw Bryan move his shotgun (Doc. No. 68 at 25–26). However, Plaintiffs claim genuine issues of fact exist as to whether the TRT allowed Bryan to comply with any orders they may have given him (Doc. No. 66 at 14). This Court agrees.

Unlike *Whitlow*, there is no evidence Bryan understood he was dealing with the police. In fact, Defendants concede nothing in the record indicates Bryan was aware of the police's presence prior to the TRT entry (Hearing at 12). *See also* Doc. No. 39-9 at 63 (dispatcher confirming officers at the scene were "blacked out" and Bryan did not "know that [they were] there"). The record is also clear that the TRT members did not identify themselves until *after* detonating the flashbang -- not *before*, like the officers in *Whitlow*. Moreover, there was no evidence the flashbang in *Whitlow* distracted the suspect such that he was unable to hear or understand the various shouts of "police" and "search warrant." The parties here provided record evidence (Doc. No. 80-1) that the flashbang used was a Defense Technology Model 8901 Distraction Device which, at a distance of five feet, produces an explosion of 175 decibels and a light flash of 6 to 8 million candelas.[2] Given this information, coupled with the fact the shooting occurred a few seconds after the flashbang, it is unclear whether Bryan was able to hear or whether his senses were impaired such that he would have been incapable of understanding the various shouts to drop his weapon. It is also unclear whether Bryan voluntarily raised his gun at the deputies, as opposed to merely raising it after being startled and roused from a reclining position.

---

[2]

This Court takes judicial notice of the product specifications for the flashbang device used, which are available from the manufacturer's website at http://defense-technology.com/products.aspx?pid=8901. *See* Federal Evidence Rule 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

Simply put, there is no single "reasonable inference" that can be drawn from the record in this case -- the reasonableness of Defendants' actions is completely dependent upon which view of the facts is accepted by a jury. More than a scintilla of evidence exists that Bryan, "through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause to believe that he posed a serious threat of harm." *Chappell*, 858 F.3d at 909. A jury could conclude Defendants used excessive force because the TRT entered with no prior negotiation or warning and the flashbang impaired Bryan's ability to see, hear, or understand Defendants' commands. On the other hand, if the jury accepts the facts as Defendants argue, their conduct would be reasonable because probable cause existed to believe Bryan posed a "threat of serious physical harm." *Garner*, 471 U.S. at 11. Either way, the issue is for a jury; this Court cannot grant immunity as a matter of law. *See Sova*, 142 F.3d at 903.

### *Supervisory and Municipal Liability Under Section 1983*

Plaintiffs seek to hold Sheriff Overmyer liable in his individual and official capacity based on his role in supervising the TRT members who committed the constitutional violations alleged in this case. A Section 1983 suit against a county sheriff in his official capacity is identical to a suit against the county. *See Fox v. Van Oosterum*, 176 F.3d 342, 347 (6th Cir. 1999). To prevail on their claim against Sheriff Overmyer in his individual capacity, Plaintiffs must show more than Sheriff Overmyer's right to control the TRT members. In other words, Plaintiffs cannot succeed solely on the theory of *respondeat superior*. *See Bennett*, 410 F.3d at 818; *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). At a minimum, Plaintiffs must demonstrate Sheriff Overmyer "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate[s]." *Bennett*, 410 F.3d at 818; *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)

19

(holding supervisors are liable under Section 1983 if they "encouraged the specific incident of misconduct or in some [] way directly participated in it").

Plaintiffs also allege Sandusky County is liable and, in that regard, assert several theories of liability: Sheriff Overmyer's decisions were the "policy" of the County, the County failed to adequately train and discipline the TRT, and failed to adequately fund the Sheriff's Department.  A municipality, like a supervisor, may not be held liable under Section 1983 simply upon the theory of *respondeat superior*. *Bennett*, 410 F.3d at 818 (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)).  Municipal liability is applicable only "when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Id.* at 818–19 (quoting *Monnell*, 436 U.S. at 694).  Moreover, municipal liability requires an "affirmative link between the policy and the particular constitutional violation alleged."  *Id.* at 819 (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).

The applicability of supervisory or municipal liability in this case rests upon the jury's conclusion regarding qualified immunity.  If the jury accepts Plaintiffs' view of the facts and determines Defendants' conduct amounted to excessive force, Sheriff Overmyer could be liable in his individual capacity, as could the County under municipal liability. On the other hand, if the jury finds Defendants' conduct reasonable, no constitutional violation occurred and qualified immunity will shield Defendants from suit.  Therefore, the parties may raise issues of supervisory and municipal liability following a resolution of the issue of qualified immunity.

**State Law Claims**

In addition to their Section 1983 claims, Plaintiffs assert state law claims against the individual Defendants for wrongful death (Count III), gross negligence (Count V), reckless conduct (Count VI),

and intentional infliction of emotional distress (Count VIII).  Plaintiffs allege Defendants acted in a "reckless and wanton manner when they disregarded a known risk of undertaking entry into the Jones home when the circumstances did not warrant that action" (Doc. No. 52 at 34).  Defendants counter they are entitled to immunity under R.C. § 2744.03(A) (for the individuals) and R.C. § 2744.02(A) (for the County).

As with supervisory and municipal liability under Section 1983, the resolution of Plaintiffs' state law claims is dependent in part upon whether qualified immunity applies to the federal claims in this case. Indeed, the Sixth Circuit observed that a showing of objective reasonableness under federal law would entitle Defendants to immunity from state law claims under Ohio law.  *See Chappell*, 585 F.3d at 916 n.3.  As discussed above, whether Defendants' conduct was reasonable is a question for a jury.  Adjudicating Plaintiffs' state law claims prior to resolving the issue of qualified immunity would be premature.

### CONCLUSION

This case presents close and difficult questions regarding the reasonableness of force used and the application of qualified immunity.  A thorough review of the record reveals genuine issues of material fact, making this case one for a jury.  Accordingly, this Court approves the Magistrate's recommendation to deny Plaintiffs' Motion for Summary Judgment; rejects the recommendation to enter summary judgment for Defendants; and sets this matter for Jury Trial consistent with this Opinion.

IT IS SO ORDERED.

    s/ *Jack Zouhary*    
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 13, 2012
