IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Tracy Jones, et al., | Case No. 3:10 CV 2261 |
| Plaintiffs, | MEMORANDUM OPINION AND ORDER DENYING |
| -vs- | SUMMARY JUDGMENT |
| Sandusky County, Ohio, et al., | JUDGE JACK ZOUHARY |
| Defendants. | |

## INTRODUCTION

Pending before this Court is Defendants' Motion for Summary Judgment and related briefing (Docs. 39, 98–99). Plaintiffs Tracy Jones ("Tracy"), individually and as the administrator of decedent Bryan Jones' ("Jones") estate, and Kim Jones ("Kim") (collectively, "Plaintiffs"), brought suit against Defendants Sandusky County, Sandusky County Sheriff Kyle Overmyer ("Overmyer"), and sheriff deputies Jose Calvillo ("Jose") and Mario Calvillo ("Mario") (collectively, "Defendants") under 42 U.S.C. § 1983 and related state-law claims.

## BACKGROUND

**The Flash-Bang Device**

This Court previously outlined the facts of this case (Doc. 81). This suit arises out of the July 11, 2010 shooting death of Jones. On that day, Tracy called 911 to report that his son, Jones, had been drinking and had threatened to kill Jones' mother, Kim (Doc. 39-9 at 2–7). At approximately 10:00 p.m., Sandusky County Sheriff Deputies arrived at the Jones home, followed shortly thereafter by

Sheriff Overmyer (Doc. 28 at 40). Upon arrival at the scene, Overmyer activated the Tactical Response Team ("TRT") (Doc. 39-9 at 37–39). For about 90 minutes prior to entering the home, deputies observed Jones through an exterior window. Viewed in the light most favorable to Plaintiffs, a jury could find that during this 90-minute period, Jones appeared to be asleep (*see, e.g.,* Doc. 39-6 at 13) -- he remained seated on a couch, with his eyes closed and a shotgun across his lap, and made few movements, none of which were threatening.

Citing concerns that Jones would ambush the deputies or harm himself, Overmyer authorized the TRT to make a "dynamic entry" into the home to apprehend Jones (Doc. 41-8 at 26). Tracy informed the TRT that the backdoor was unlocked, and also explained the home's layout. Overmyer and TRT leader Jose then devised the TRT's entry plan. The TRT planned to enter through the backdoor, detonate a flash-bang device as a diversion after entry, and then apprehend Jones. At approximately 11:30 p.m., three TRT members covertly entered the home by way of the backdoor, entering the kitchen first (Doc. 39-6 at 22–24). After peeking around the corner into the adjacent living room where Jones remained seated on the couch, a TRT member threw a flash-bang device into the living room (Doc. 39-7 at 16). After detonation of the flash-bang, the three TRT members rushed into the living room, identifying themselves as law enforcement and yelling for Jones to put down the shotgun. According to the three TRT members, Jones moved the barrel of the gun. Jose and Mario fired their weapons, killing Jones (Doc. 39-7 at 20).

**Procedural Posture**

The Sixth Circuit remanded this case, following interlocutory review of this Court's Order denying Defendants' Motion for Summary Judgment (Doc. 81 at 21). In evaluating Plaintiffs' excessive force claims, this Court followed the segmented approach outlined in *Dickerson v.*

2

*McClellan*, 101 F.3d 1151 (6th Cir. 1996), dividing its qualified-immunity analysis in thirds: (1) entry into Jones' home without a warrant; (2) use of a flash-bang device when entering the living room; and (3) use of deadly force. *Jones v. Sandusky Cnty.*, 889 F. Supp. 2d 990, 1002 (N.D. Ohio 2012). After oral argument, this Court denied the parties' cross-Motions for Summary Judgment, because "the reasonableness of [D]efendants' actions [was] completely dependent upon which view of the facts is accepted by the jury." *Id.* at 1005. The Sixth Circuit affirmed with respect to the search warrant and deadly force claims, but remanded with respect to the flash-bang claim so this Court could examine whether use of the flash-bang device violated a constitutional right that was clearly established in July 2010.

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id.* The court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, it determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

## DISCUSSION

### Qualified Immunity

Defendants assert they are entitled to qualified immunity on the flash-bang claim because the TRT's use of the device did not violate any clearly established constitutional right.

3

The doctrine of qualified immunity shields from civil liability government officials who perform discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004). When raised by way of summary judgment, qualified immunity must be denied when: (1) facts taken in the light most favorable to the plaintiff show a constitutional violation, and (2) the relevant constitutional right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). When evaluating established law on excessive force claims, this Court must first look to the decisions of the U.S. Supreme Court, then to decisions of the Sixth Circuit, then to decisions of district courts within this Circuit, and, finally, to decisions of courts in other circuits. *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991).

The Supreme Court has established a two-step analysis for assessing qualified immunity. First, viewing the facts in the light most favorable to the injured party, "do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if a violation can be found, this Court must then determine whether the right was clearly established at the time of Defendant's conduct. *Id. See also Pearson*, 555 U.S. at 232. An officer's conduct may violate a clearly established constitutional right "where the violation was sufficiently 'obvious' under the general standards of constitutional care that the plaintiff need not show 'a body' of 'materially similar' case law [or ] the violation [may be] shown by the failure to adhere to a 'particularized' body of precedent that 'squarely govern[s] the case.'" *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2004) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004)).

**Pre-July 2010 Case Law**

In *United States v. Dawkins*, 83 F. App'x 48, 51 (6th Cir. 2003), the Sixth Circuit ruled that use of a flash-bang device was objectively reasonable under the circumstances, but warned "the court is mindful that the use of flash-bang devices will be inappropriate in many cases." In *Dawkins*, police deployed a flash-bang device while executing a search warrant at the home of a violent felon. An informant warned officers the felon had firearms in the home. *Id.* at 49. The Sixth Circuit reasoned that because officers knew the suspect possessed an assault rifle and had previously been convicted of a violent crime, the use of a flash-bang device was objectively reasonable. *Id.* at 51.

*Dawkins* is inapt to this case. In *Dawkins*, the tactical unit "pounded on the door several times while announcing 'Police. Search warrant,'" before deploying the flash-bang, putting a violent felon on notice of their presence. *Id.* at 49. Because Dawkins knew the police were present, he could have harmed the entering police, who deployed the flash-bang to gain entry "with the greatest possibility of not having shots fired on them as they enter[ed] the door and [the officers] having to return fire." *Id.* He also could have complied with police demands and avoided the forceful entry. Here, a jury could find that Jones had been asleep for almost 90 minutes, the TRT entered the house without waking him, and did not announce their presence until *after* detonating the flash-bang device. A jury could conclude Jones posed no immediate threat to the officers, and was not given the opportunity to comply with police commands before police lobbed a flash-bang grenade at him.

A second relevant Sixth Circuit case, *Estate of Bing v. City of Whitehall*, 456 F.3d 555, 571 (6th Cir. 2006), held that use of a flash-bang could be excessive force. In *Bing*, police officers and SWAT team members surrounded Bing's home, who allegedly used a shotgun to frighten a group of minors away from his property. *Id.* at 559. Officers tried to communicate with Bing by yelling

5

through the home's windows, inserting a "bag phone" into the home, and using a police cruiser's external loudspeaker. *Id.* at 561. After several failed attempts to establish communication with Bing, police fired six canisters of pepper gas into the home. *Id.* Again, Bing refused to surrender, so officers detonated a first flash-bang. Bing responded by shooting at police. *Id.* Determining that Bing posed an immediate danger to officers and bystanders, police decided to enter the home. Upon entry, Bing and SWAT team members exchanged gunfire. Officers at the rear of the house deployed a second flash-bang device in an attempt to distract Bing from the officers who were making entry at the front of the home. *Id.* at 562. The second flash-bang device ignited flammable material in the home, engulfing the house in fire. Bing's body was discovered by firefighters during a subsequent search of the home; he had been shot in the back. *Id.*

The Sixth Circuit held that use of the first flash-bang was reasonable force because the police's interest in employing the flash-bang device outweighed Bing's interest in avoiding it -- Bing posed a serious and immediate threat to police and bystanders, and refused to surrender to police. *Id.* at 569. But for purposes of the analyzing use of the second flash-bang device, the Sixth Circuit assumed the officers "knew that such devices would likely ignite flammable materials and thereby cause a fire." *Id.* at 570–71. In those circumstances, use of the second flash bang device was unreasonable, excessive force. *Id.* at 569–70.

Drawing inferences from record facts in Plaintiffs' favor, the standard articulated in *Bing* placed Defendants on notice that their conduct violated the Constitution. After *Bing* was published in 2006, Defendants were on notice that police use of a flash-bang device could be unreasonable force if detonating such a device substantially increases harm to a suspect. Indeed, a jury could find the constitutional violation in this case even more clear-cut than that in *Bing*. Unlike *Bing*, Jones had not

6

fired a gun at neighbors or officers. Nor had he refused to surrender to police. Jones was instead asleep for some time and police, at best, made one failed attempt to talk to him; Jones made no threatening gestures with the shotgun he held on his lap during that time; and his mom, against whom Jones made the earlier verbal threat, was not nearby. A jury could find that Jones posed no immediate risk to anyone until (at the earliest) after the TRT deployed the flash-bang. Moreover, a jury could conclude that a reasonable officer would know that if the officer awakened a sleeping suspect with a flash-bang device, the explosion would disorient the suspect. A reasonable officer would know that, staggered by the explosion, the disoriented suspect likely would shift any object he may be holding, including a firearm. A reasonable officer would also know that such a staggered suspect, previously asleep, would appear threatening, thereby substantially increasing the risk that officers would use deadly force against a suspect who does not intend on harming police.

Finally, prior to July 2010, a district court within this Circuit denied summary judgment on qualified immunity grounds on an excessive force claim that arose out of use of a flash-bang device. *Marmelshtein v. City of Southfield*, 2009 U.S Dist. LEXIS 90402 (E.D. Mich. 2009), *rev'd in part*, 421 F. App'x 596 (6th Cir. 2011). Relying on *Bing* and other excessive-force case law, the district court concluded that a jury could find police, executing a search warrant related to drug possession and deploying a flash-bang device against the Marmelshteins, occupants of the raided house, in violation of clearly established constitutional law. The district court found factual disputes as to whether, prior to use of the flash-bang device, the Marmelshteins had warning of police presence, posed a threat to police, or otherwise tried to evade or resist capture. *Id.* at * 9–11. The Sixth Circuit reversed, noting "the only published case from this circuit dealing with flash-bang devices, [*Bing*,] held in 2006 that there was no clearly established right against their use, even around known

7

accelerants." *Marmelshtein v. City of Southfield*, 421 F. App'x 596, 603 (6th Cir. 2011). For the Sixth Circuit, the district court's error was one of chronology; the district court had relied on a Sixth Circuit decision, published in *August 2006* and finding a Fourth Amendment violation (albeit one not clearly-established under then-existing precedent), to conclude the same constitutional right was clearly established in *December 2004*, when the search warrant was executed. *See id.* No such chronological problem exists here; *Bing* predates the conduct at issue in this case, and provided Defendants clear notice that their use of a flash-bang could be excessive force.

Though this Court does not depend on such cases, courts outside the Sixth Circuit also have held the use of flash-bang devices constitutes excessive force when "police showed a clear disregard for the safety of the occupants of the home." *Ramage v. Louisville/Jefferson County Metro Gov't*, 520 F. App'x 341, 346 (6th Cir. 2013). *See also Estate of Excobedo v. Bender*, 600 F.3d 770, 784–86 (7th Cir. 2010) (holding that police decision to deploy a flash-bang device into rooms without first visually checking for people constituted excessive force); *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005) (holding that police used excessive force when they detonated a flash-bang against a suspect with a known heart condition and other health problems); *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997) (expressing concern over the use of a flash-bang device in a house where innocent and unsuspecting children were present).

Drawing all inferences from record facts in Plaintiffs' favor, a jury could find that, after entering Jones' home covertly, police used a flash-bang device against a sleeping suspect who posed no immediate threat to police, without giving Jones an opportunity to comply with police requests to drop the shotgun that lay immobile on his lap, and in a manner that substantially increased the risk that Jones, disoriented and awakened, would not comply with (or not understand) police commands,

8

would be perceived as a threat to the TRT members, and would be subjected to deadly force. Under *Bing*, a reasonable officer would know that use of a flash-bang device in such circumstances violates a suspect's Fourth Amendment rights.

## CONCLUSION

Because a jury could conclude that Defendants' use of a flash-bang device was excessive force, and could further find that a reasonable officer would have known that use of a flash-bang device under the circumstances constituted excessive force, Defendants are not entitled, as a matter of law, to qualified immunity. Defendants' Motion for Summary Judgment (Doc. 39) is denied.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

July 16, 2014