IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Kim Jones, *Individually and as*                    Case No. 3:10 CV 2261
*Executrix/Administrator of the Estates*
*of Tracy Jones and Bryan Jones, Deceased*,          MEMORANDUM OPINION
                                                     AND ORDER DENYING
                                                     <u>MOTION FOR NEW TRIAL</u>
                        Plaintiff,
                                                     JUDGE JACK ZOUHARY
        -vs-

Sandusky County, Ohio, et al.,

                        Defendants.


**INTRODUCTION**

In October 2014, after a four-day trial, a jury rejected Plaintiff Kim Jones' claims that Sandusky County, County Sheriff Kyle Overmyer, and two sheriff deputies (brothers Jose and Mario Calvillo), violated federal and state law during the July 2010 shooting death of her son, Bryan Jones. Plaintiff timely moved for a new trial (Doc. 188). For the reasons below, this Court denies the Motion.

**BACKGROUND**

The facts of this case have been developed over more than four years of litigation, including an interlocutory appeal to the Sixth Circuit, and are briefly stated here.

On July 11, 2010, Sandusky County Sheriff deputies responded to a 911 call from Tracy Jones (Kim Jones' husband and Bryan Jones' father, who passed away during this litigation). Kim Jones had earlier left the Jones home to spend the evening watching television with her mother and sister,

Sherry Keller, at her mother's nearby home.  Tracy Jones, preparing to leave home for his night-shift job, encountered Bryan at roughly 9:00 PM at the Jones home where Bryan lived with his parents. Tracy Jones called police dispatch and relayed that Bryan had been abusing alcohol for several days, had threatened to kill his mother, told his father to call the police and that he, Bryan, would "fight."

Arriving after dark, sheriff deputies observed Bryan, through an exterior first floor window, sitting on the living room couch with a pump-style shotgun resting on his lap and his feet resting on a coffee table.  The living room lay at the north end of the home, with a computer room adjoining to the south, and a kitchen further south.

Bryan sat facing the deputies' vantage point.  For the next 90 minutes, the deputies observed Bryan in the same posture; he made few movements.  One deputy speculated that Bryan may have been dead (he was not).  Sheriff Overmyer eventually ordered a four-member Tactical Response Team ("TRT" or SWAT team) into the home.

Around 11:30 PM, the TRT entered the home through the unlocked exterior kitchen door. Their plan: after a stealth entry into the kitchen, the deputies would "stack up" alongside the wall separating the kitchen from the computer room.  Then, Deputy Kevin Karns would lob a flashbang grenade across the computer room and into the living room.  At the same time, Fremont Police Sergeant Anthony Emrich, standing outside the home at the living room's north window, would shatter that window with his asp, a type of telescoping baton.  Both the flashbang and shattered window were intended to distract and disorient Bryan.

With guns drawn and shouting commands such as "Drop it!," three of the four TRT members would then rush Bryan, either as a show of force in hopes that he would drop the shotgun or to physically subdue him.  Mario Calvillo, first in line, carried a ballistics shield and a handgun.  TRT

2

team leader Jose Calvillo, second in line, held an M16 rifle in both hands. Karns, last in line, carried a carbine; Karns had attached the carbine to his bullet-resistant vest with a lanyard-like device, leaving Karns' hands free to manipulate the flashbang. Deputy Allen Dorsey would remain in the kitchen as a rearguard.

The TRT executed the entry plan, which ended with both Calvillos fatally shooting Bryan, who died just before midnight, despite attempts by emergency responders to save his life.

The jury heard conflicting evidence on whether the flashbang startled Bryan from sleep, whether he raised the shotgun toward the deputies, and whether the smoke from the flashbang made it difficult to determine if Bryan's movements were harmless or threatening. Kim Jones claimed errors in the police response resulted in the needless killing of her son. Defendants claim that, as the TRT entered the living room, Bryan swung the shotgun barrel in the TRT's direction and "racked" the shotgun (also called "pumping" or "ratcheting," the action that ejects a spent shotgun shell (if any) and fills the chamber with a fresh shell). Mario Calvillo claimed he was so certain Bryan would shoot him that he braced for the impact of a shotgun blast. No party disputes that Defendants believed the shotgun was loaded -- during his 911 call, Tracy told dispatch there were loaded guns in the home, and dispatch relayed that information to the deputies. In fact, the shotgun was *not* loaded.

Prior to the TRT entry, deputies called Tracy to the scene. Tracy offered to talk Bryan into laying down the shotgun, but deputies declined the offer, citing the threat Bryan posed. Separately, Kim and her sister approached the home, but a park ranger positioned at the end of the Jones driveway prevented them from proceeding further, at least in part because Bryan had threatened Kim's life. When the sisters heard an explosion and gunshots, they ran past the ranger; Keller, along with Tracy, claimed they heard Bryan cry "Why!?" before he was shot.

3

Kim Jones raised at trial 42 U.S.C. § 1983 claims, alleging excessive force by use of the flashbang and the shooting.  She also brought state-law wrongful death and intentional infliction of emotional distress ("IIED") claims against Sheriff Overmyer and both Calvillos.  This Court granted a directed verdict in Defendants' favor on the IIED claim; the jury rejected all other claims.

## STANDARD OF REVIEW

Kim Jones moves for a new trial pursuant to Federal Civil Rule 59(a).  "District courts are afforded broad discretion in deciding whether to grant a motion for a new trial."  *Clarksville-Montgomery County School Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991).  "Unless justice requires otherwise, no error in admitting or excluding evidence -- or any other error by the court or a party -- is grounds for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."  Federal Civil Rule 61.  Because "a jury reaches its verdict in light of the evidence as a whole, it makes no sense to try to analyze errors in artificial isolation, when deciding whether they were harmless."  *Beck v. Haik*, 377 F.3d 624, 645 (6th Cir. 2004), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc).  Therefore, this Court considers the effect each asserted error had on the jury's verdict by itself, then considers the effect of the asserted errors as a whole.

## DISCUSSION

Plaintiff argues she is entitled to a new trial based on the cumulative effect of four alleged errors.  First, she argues she was prejudiced by three erroneous evidentiary rulings.  Second, she contends this Court erroneously prevented the jury from considering whether Sheriff Overmyer wrongfully caused Bryan's death.  Third, she claims defense counsel committed misconduct during closing argument by referring to matters ruled off-limits by this Court.  Fourth, she asserts this Court

4

erred in granting Defendant's request for a directed verdict on the IIED claim against Sheriff Overmyer.

### Evidentiary Rulings

**Standard.**  The claims of evidentiary error relate to this Court's decisions to exclude certain evidence.  This Court must consider whether any ruling was erroneous and, if so, whether the ruling was harmless:

> That inquiry involves an assessment of the likelihood that the error affected the outcome of the case.  As the Supreme Court has described the test: 'If one cannot say, with fair assurance that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.' Application of this test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected, and the centrality of that issue to the ultimate decision.

*Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 157 (6th Cir. 1988) (quoting *Jordan v. Medley*, 711 F.2d 211, 218–19 (D.C. Cir. 1983) (Scalia, J.)) (internal citations, ellipsis, and brackets omitted).  If a district court errs by excluding evidence for one reason (*e.g.*, relevance), but the evidence could properly be excluded for another reason (*e.g.*, hearsay), the error is harmless.  11 WRIGHT & MILLER, FED. PRAC. & PROC. § 2885 (3d ed.).  Plaintiff bears the burden of showing an error was not harmless.  *See Varga v. Rockwell Intern. Corp.*, 242 F.3d 693, 701–02 (6th Cir. 2001).

**The Unloaded Gun.**  This Court prohibited reference to the fact that Bryan's gun was unloaded, ruling "there should be no comment or testimony on the unloaded gun for the purpose of showing Bryan's intent" because no party disputed (then or now) that the deputies thought Bryan held a loaded gun (Doc. 163 at 3; *see also* Doc. 161 at 1).

Plaintiff argues evidence that the shotgun was unloaded should have been presented to the jury for three reasons.  First, she argues the evidence refuted defense police practices expert James

Scanlon's testimony that Bryan was "'lying in wait' for [the TRT] to enter so that Bryan could ambush them" (Doc. 188 at 4). Plaintiff argues there is no basis to assume Bryan was aware of the TRT's presence and he could not have intended to ambush the deputies with an empty shotgun.

Second, she argues the absence of ammunition in the shotgun "should have been allowed to challenge the credibility" of the deputies who claim they saw Bryan point the gun barrel in their direction. "[I]t would have been completely illogical for Bryan to point the gun directly at the TRT since it was not loaded" (*id*. at 5). The evidence also would have shown that Bryan did not hear the TRT's command to drop the weapon because "he certainly would have done so, knowing that his unloaded gun would be of no use to defend him from the firepower used by the TRT" (*id*.).

Third, because Scanlon's testimony "ascribed to Bryan an intent [to ambush the deputies] that he was incapable of having had" -- presumably because he could not "ambush" the deputies with an unloaded gun -- Plaintiff appears to argue that Scanlon's testimony "opened the door" to evidence that the gun was unloaded (*id*.).

Scanlon testified that "When you're dealing with someone like Bryan Jones, this is probably the most dangerous situation you can possibly respond to as a tactical officer" (Doc. 195 at 9). That opinion and the testimony that followed was based not on any subjective intent Scanlon ascribed to Bryan Jones, but rather on information, relayed to deputies at the scene, indicating Bryan was homicidal or suicidal (*see id*. at 8–10) (referencing the 911 phone call, dispatch chatter, and the deputies' knowledge that Bryan had previously been convicted of participating in a drive-by shooting on an occupied residence). Scanlon also testified that "[m]any of the indicators" of suicide-by-cop behavior were present in this case, again based on facts known to officers at the scene (*id*. at 27–28). Plaintiff did not object at any point in Scanlon's testimony to argue that his testimony "opened the

6

door" to now allow the excluded evidence.  Further, Scanlon's opinions were not "inconsistent" with the fact that the gun was unloaded, nor did they rely on an attempt by Scanlon to peer inside the mind of Bryan to determine his subjective intent.

Plaintiff's credibility-based avenue for admitting the fact the gun was unloaded also is unpersuasive.  Even assuming the evidence is admissible to impeach the testimony of the Calvillo deputies through contradictory facts, the evidence was properly excluded under Federal Evidence Rule 403.  For starters, the evidence was cumulative of other evidence offered in support of Plaintiff's theory that Bryan was shot while startled, sitting on the couch, and with the shotgun still lying on his lap with the barrel pointing toward the living room's north wall, away from the deputies.  For example, the jury viewed an animation depicting the shooting by Jose and Mario Calvillo in this way. Plaintiff also elicited testimony from medical examiner Dr. Maneesha Pandey that bullet entry and exit wounds were consistent with Bryan being shot in this manner (though the same witness testified that the wounds were consistent with Jose and Mario Calvillo's testimony that they shot Bryan as he raised the shotgun and rotated his torso in their direction).

More important, had the evidence been admitted, Defendants faced a great likelihood that the jury would have considered the evidence for an improper purpose.  Because the gun was not loaded, the jury may have concluded Bryan did not pose a threat of serious bodily harm, despite Defendants' unchallenged belief that the gun was loaded.  *See, e.g.*, *Chappell v. City Of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009).  Plaintiff's assurance that a limiting instruction would have avoided such improper use is belied by the vague, half-instruction -- offered now for the first time.  *See* Federal Civil Rule 51(d).  Plaintiff proposes that the jury should have been told "that even though the gun was unloaded, such fact should not be considered for the purpose of determining whether the Defendants

acted reasonably, based upon what they *actually* knew at the time" (Doc. 188 at 6 (emphasis in original)).  She does not explain what guidance this Court should have given the jury regarding *how* they could use this fact (*see* Doc. 200 at 8; Doc. 203 at 2–3).

Finally, this Court notes that, throughout trial, Plaintiff implied through argument or elicited testimony from witnesses that suggested the gun was unloaded, despite this Court's ruling that the subject was off-limits for both sides, and despite the absence of any facts in evidence that would suggest, prior to the shooting, the deputies had reason to doubt the shotgun was loaded.

During opening argument, Plaintiff's counsel promised the evidence would show that, though Tracy Jones had earlier told dispatch there were loaded guns in the home, no officer later asked if there was any ammunition in the home that could be used in the guns.  Plaintiff's counsel asked Karns whether he saw ammunition in the home during the inspection *after* the shooting; asked Mario Calvillo whether he saw ammunition in the home before entry; asked Jose Calvillo whether Kim Jones mentioned ammunition or noticed ammunition in the home before entry.  And during closing argument, Plaintiff's counsel referred to ammunition twice.  After questioning why police lowered all the window blinds in the home after the shooting, and implying that police rummaged through the second floor, Plaintiff's counsel stated: "But I do suggest to you that there was no evidence by anyone -- that they made any inquiry concerning ammunition.  None" (Doc. 191 at 9–10).  Later, Plaintiff's counsel asked "why -- why didn't they take the normal precautions to gather information that would help them know whether it [*i.e.*, the shotgun] was actually loaded"? (*id*. at 16).

At least in part, Plaintiff concedes comments by her counsel may have caused the jury to speculate about whether the shotgun was loaded (Doc. 203 at 2–3).  And Plaintiff argues, therefore, the jury should have received evidence of the fact the shotgun was unloaded.  This is a curious

8

argument, to say the least.  Aside from failing to show error in this Court's ruling, Plaintiff should not be heard to object to an evidentiary ruling by which her counsel arguably did not abide.

**Jose Calvillo's Disciplinary History.**  Next, Plaintiff objects to the exclusion of evidence of three past episodes that led the Sheriff to discipline Jose Calvillo.  In September 2007, Jose Calvillo was disciplined for insubordination for refusing to follow orders.  In July 2009, he was again disciplined after an altercation with a man and a taxi driver during a night out.  Finally, in November 2009, officials transferred Jose Calvillo from patrol duty to jail work after a former girlfriend complained he was stalking her.  This Court excluded the evidence, noting all three episodes centered on Jose Calvillo's relationships with women with little or no relevance to the events of July 2010, and that any impeachment value the evidence might have was speculative (Doc. 140 at 8).

Plaintiff now argues this Court ruled "there was no suggestion that Deputy Jose Calvillo disobeyed a direct order *that night*" (Doc. 188 at 7 (emphasis in original)).  It is unclear what point the use of emphasis is meant to convey.  Even though Jose Calvillo had been disciplined (in part) for on-the-job misconduct, Plaintiff still does not argue that he acted in a similar manner in July 2010 (*see* Doc. 140 at 8).  Nor does Plaintiff point to any evidence of prior complaints or discipline of excessive force by Jose Calvillo.

Rather, Plaintiff argues the jury should have learned of the disciplinary proceedings to undermine Jose Calvillo's credibility.  But, Plaintiff's own phrasing of how she would have used this evidence refutes any contention the evidence would have served to impeach.  It is instead character evidence, inadmissible under Federal Evidence Rule 404(a), and past-bad-acts evidence, inadmissible under Rule 404(b).  Plaintiff tells this Court that the evidence shows the Sheriff and the County knew of "Jose Calvillo's improper use of his position as a deputy to intimidate others"; that "Jose Calvillo

9

at times exhibited poor impulse control"; and that he had "a tendency to deny the inappropriateness of his behavior" (Doc. 188 at 7).  In short, Jose Calvillo did bad things in the past; he probably "acted in accordance with th[at] character" on July 11, 2010.  Federal Evidence Rule 404(b).

Even granting the premise that Jose Calvillo's disciplinary history is not character evidence, and assuming that Plaintiff only intended to inquire about these episodes on cross-examination, this Court would have exercised its discretion under Rule 403 to bar inquiry into these matters.

> The probative value of specific-instances evidence offered under [Rule 608(b)] derives from the fact that this evidence may help the trier of fact accurately determine witness credibility.  The degree of probative value can be a function of a number of factors. These include whether the testimony of the witness in question is crucial or unimportant, the extent to which the facts to which the witness has testified are in dispute, the extent to which the evidence is probative of truthfulness or untruthfulness, the extent to which the evidence is also probative of other relevant matters, the extent to which an act of truthfulness or untruthfulness is connected to the case, the extent to which the circumstances surrounding the specific instances of conduct are similar to the circumstances surrounding the giving of the witness's testimony, the nearness or remoteness in time of the specific instances to trial, the likelihood that the alleged specific-instances of conduct in fact occurred, the extent to which specific-instances evidence is cumulative or unnecessary in light of other evidence already received on credibility, and whether specific-instances evidence is needed to rebut other evidence concerning credibility.

28 WRIGHT & MILLER, FED. PRAC. & PROC. § 6118 (2d ed.) (footnotes omitted).

Jose Calvillo's testimony was, of course, important.  But, at best, his prior disciplinary history marginally reflects his character for truthfulness, and is not probative of other relevant matters.  Two of these prior events involved allegedly troublesome aspects of Jose Calvillo's social life.  The third event, involving insubordination, is the most remote in time of the three events, and again, Plaintiff's case theory is that Jose Calvillo obeyed, not disobeyed, Sheriff Overmyer's orders on July 11, 2010. And as the extensive briefing on this issue shows, while no party disputes Jose Calvillo was in fact disciplined for these prior events, the conduct that led to this discipline is highly disputed.  Inquiry

10

into these matters would have posed a risk of jury confusion, leaving the jury wondering why it was learning of Jose Calvillo's alleged confrontations with a taxi cab driver in 2009 during a trial regarding an on-duty shooting death in 2010.

**Detective Captain Consolo's Opinions and Report.**  Plaintiff objects to two related evidentiary rulings regarding an internal investigation initially handled by Sandusky County Detective Captain James Consolo.

Dispatch called Consolo to the Jones residence within an hour of the shooting (as a matter of policy, the Sheriff's Office has its detective bureau gather evidence regarding an officer-involved shooting).  Consolo visited the scene, interviewed the deputies who responded to the 911 call, and listened to the 911 call and dispatch chatter, gathering evidence to eventually submit a Report to a Shooting Review Panel.  His Report concluded that further investigation was warranted.

Defendants moved to exclude two exhibits -- the Report as it was submitted to the Panel, in which Consolo summarized the July 11 events and presented his own investigation progress notes; and a two-page document in which Consolo opined about flaws in the TRT entry.  Originally included in the Report as Consolo submitted it to the Sheriff, Sheriff Overmyer removed the two page "opinion" addendum from the version he submitted to the Panel, concluding Consolo overstepped his fact-gathering assignment by opining on the TRT entry.

This Court excluded the Report and the opinion addendum (and testimony about it), holding the evidence was in part inadmissible hearsay and in part lacked foundation.  In the alternative, this Court exercised its discretion under Rule 403 to exclude the exhibits.  This Court noted the Panel's mandate (whether the shooting "violate[d] any agency directive, general order, and/or state or local law" -- Doc. 111 at 3) differed from the focus of trial (whether Defendants used excessive force or

11

recklessly caused Bryan Jones' death).  This Court also explained that Consolo based his investigation on a different record than would be presented to the jury.  And this Court stated that certain issues Consolo investigated or commented on were for the jury to decide (Doc. 140 at 3–4).

Even assuming the exhibits were admissible under the public records exception to Federal Evidence Rule 802, *see, e.g.*, *Perrin v. Anderson*, 784 F.2d 1040, 1046–47 (10th Cir. 1986); *Wilson v. Beebe*, 770 F.2d 578, 590 (6th Cir. 1985) (en banc); *but see* Doc. 111 at 3, 7–10, this Court could still bar the evidence under Rule 403.  In the alternative, Plaintiff fails to show error that is not harmless.

The jury learned much (if not all) of the evidence summarized in the Report through the firsthand testimony of witnesses and related exhibits.  For example, the jury viewed Plaintiff's animation of the TRT entry.  During Emrich's testimony, the jury learned that he told Consolo that he made a "bad move" by placing himself at a "cross-fire window."  The Report could have been used for impeachment purposes if, for example, Jose or Mario Calvillo gave inconsistent statements.  Whether a "medical emergency" actually motivated the TRT's entry was exhaustively explored during trial.  Similarly, Defendants explain why the views contained in the opinion addendum reached the jury through the testimony of Plaintiff's police practices expert, D.P. Van Blaricom, or related to matters only marginally probative of Defendants' liability under federal or state law (*i.e.*, positioning Emrich outside the home and within the TRT's line of fire placed Emrich at risk of being shot) (Doc. 200 at 17–19).

### The Overmyer Jury Questions and Verdict Form

This case presented the jury with interrelated theories of liability.  Sheriff Overmyer, for example, could not be held liable under Section 1983 if the jury found Jose and Mario Calvillo did

not use excessive force.  To guide the jury in considering the claims, this Court worked with the parties to craft jury interrogatories and special verdict forms -- a "Questions and Verdict Form" -- which accompanied this Court's final jury instructions.  The jury was instructed to consider the claims against each Defendant in a way that would facilitate deliberations.  For example, the jury was told to skip consideration of the federal-law claims against Sheriff Overmyer if it found neither Jose Calvillo nor Mario Calvillo liable under Section 1983.

With respect to the state-law wrongful death claim asserted against Sheriff Overmyer, the Questions and Verdict Form advised (Doc. 186 at 3, 6–8 (bolded text in original)):

> If you answered "yes" to Question 6 for **both** Jose Calvillo and Mario Calvillo [Question 6 read: "Do you find that [Jose or Mario] Calvillo has proved **self defense** [under a state-law instruction] by the greater weight of the evidence?"], then you do not need to answer Question 4 below [Question 4 read: "Do you find that Plaintiff has proved by the greater weight of the evidence the claim against Kyle Overmyer of **Wrongful Death?**"]; if you answered "no" to Question 6 for either Jose Calvillo or Mario Calvillo, then answer Question 4 below.

But as originally submitted to the jury, the Questions and Verdict Form did not tell the jury how it should approach Sheriff Overmyer's wrongful-death liability if it determined both Jose and Mario Calvillo did not wrongfully cause Bryan's death.

The jury noted this omission.  Midway through deliberations, the jury asked: "If we answer question #5 (on the forms for the Calvillo's [*sic*]) 'no,' do we need to answer #6?" (Doc. 203-1 at 1).  Question 5 read, "Do you find that Plaintiff has proved by the greater weight of the evidence the claim against [Jose or Mario Calvillo] of **Wrongful Death**" (*id.* at 3, 6 (bolded text in original)).  After an on-the-record discussion with counsel, this Court and counsel agreed that the answer to this first jury question should be "no" (Doc. 202 at 2).  Jose and Mario Calvillo's state-law self-defense would only apply to excuse liability on the wrongful death claim asserted against them; if either deputy were not

13

first held liable on the wrongful death claim, the jury did not have to reach the defense as to that

Defendant.

A short while later, the jury posed a related question: "If we didn't have to answer #6 for the

Calvillo's [*sic*], do we have to answer #4 on the form for Mr. Overmyer?" (Doc. 203-1 at 1).  This

Court discussed the jury's question with counsel (Doc. 202 at 2–4):

> THE COURT:  We're on the record.  All counsel are present, three in person, one[, lead defense counsel,] by phone.  We have been reviewing question number two from the jury which they placed on Joint Exhibit A immediately following the first question. And that question reads [as noted above].  We've had a brisk discussion about an appropriate answer.  The Court, after review and listening, believes that consistently the appropriate answer [should] be no.  And I propose to answer that the same way I did their first question, just write the word no on the sheet.  Defense counsel agrees.
>
> Plaintiff's counsel disagrees and believes yes should be the answer.  And I'll give you an opportunity to articulate on the record why you believe yes should be the answer to the second question posed by the jury.
>
> [Plaintiff's counsel]: Well, there's a few reasons.  First is by answering the question the way The Court proposes, it would suggest they've already reached a decision, and that may very well be.  We don't know that because oftentimes jurors come back with a question in order to explain the questions to a holdout or for whatever reason.  You can't really unnecessarily infer what they've done based on the question.  But as I think I tried to argue a minute ago, it is possible that the sheriff could have liability for the entire project that resulted in this man being killed, even if later on it were determined, or even if beforehand it were determined that the two police officers had no individual liability.
>
> THE COURT: I'll just briefly comment.  I don't know whether the jury is walking through these or actually filling them out.  They've certainly posed a specific question indicating if we answered number six a certain way for the Calvillos, do we have to answer a specific question on the form for Mr. Overmyer, and the form for Mr. Overmyer included a couple possibilities.  But the jury, frankly, astutely noted that it did not contain this third possibility, and that is if you answered no for -- on number five -- the Calvillos.  And so I give them credit for that, and I think we need to help them because the verdict form does not contain the answer to the question they've posed. And whether they're just hypothetically talking amongst themselves or they've actually filled it out makes no difference to me, I don't know.  But we have to give them an accurate answer and I think we have, I believe that.  And I have not been presented with a scenario that I believe would allow for the deputies to escape liability

14

under the wrongful death statute, and then for some reason have the sheriff responsible under the wrongful death statute.

And so that's the answer we will send in to the jury.  And plaintiff may have their objection. Thank you.

Because the jury found neither Calvillo liable on any claim, it did not answer any of the questions relating to Sheriff Overmyer.  The parties do not dispute that, by leaving Sheriff Overmyer's question form blank, the jury followed the jury instructions and Questions and Verdict Form as supplemented by this Court's answers to jury Questions One and Two.

While Plaintiff no longer presses the first of the two arguments for answering "yes" to the jury's second question (that "no" was an inappropriately suggestive answer), Plaintiff continues to argue "findings [that Jose and Mario Calvillo were not liable] should not *automatically* have excused Defendant Overmyer from liability for his own actions [for wrongful death].  There was sufficient evidence for a jury to find that Sheriff Overmyer" wrongfully caused Bryan's death (Doc. 188 at 14 (emphasis in original)).  Plaintiff agrees this Court's final jury instructions accurately stated Ohio law respecting the wrongful death claim, but argues that the Questions and Verdict Form, together with this Court's answer to jury Question Two, erroneously prevented the jury from considering Sheriff Overmyer's liability under state law.

"[A] jury's verdict [should be set aside] on the basis of improper instructions only when the instructions, when viewed as a whole, are confusing, misleading, and prejudicial." *Barnes v. Owens-Corning Fiberglas Corp*., 201 F.3d 815, 822 (6th Cir. 2000) (internal quotation marks omitted).  This Court has discretion in whether, and how, to respond to jury questions posed during deliberations. *See United States v. Fisher*, 648 F.3d 442, 446 (6th Cir. 2011).  Plaintiff must show this Court abused that discretion, and that she suffered prejudice in view of all the record evidence.  *See, e.g*., *United States v. Foster*, 507 F.3d 233, 244 (4th Cir. 2007).

15

At the time this Court discussed jury Question Two with counsel, Plaintiff did not explain how the jury could consistently find that, on the one hand, Jose and Mario Calvillo should escape liability under state law while, on the other hand, Sheriff Overmyer should not.  By contrast, Defendants explain that a finding of no-state-law-liability for the deputies (Doc. 200 at 24–25):

> makes it impossible for the Sheriff to be found to have acted recklessly or wantonly, either, [a necessary finding given principles of state-law immunity, *see* Ohio Rev. Code § 2774(A)(6)(b)].  The Deputies carried out an entry plan conceived and ordered by the Sheriff.  If their actions were reckless or wanton it was because the plan conceived and ordered by the Sheriff was reckless or wanton.  The converse is also true.  Since the jury found the Deputies did not act recklessly or wantonly when finding them not liable for wrongful death, that finding means that neither the entry plan nor the shooting were reckless actions causing Bryan Jones' death.

Defendants have the better argument.  Though Plaintiff provides this Court little help understanding the precise nature of her argument,[1] Plaintiff apparently believes that Sheriff Overmyer's actions assembling the TRT, discussing the entry plan, and sending the TRT into the Jones home show the Sheriff recklessly caused Bryan's death.  Under this apparent theory, a jury would base Sheriff Overmyer's liability on his lack of familiarity with the TRT manual; his decision to "go dark" (*i.e.*, directing responding officers that they should not illuminate the Jones home or use their vehicle emergency lights); his attempt to call Bryan on the home landline phone (which,

---

[1]

With the exception of her "following-orders" argument, presented in her reply brief, Plaintiff has yet to identify the specific evidence to support a jury finding of wrongful-death liability for Sheriff Overmyer but not for the Calvillos (hence, this Court's need to construct what it believes to be the factual basis for Kim Jones' argument on this point).  Ordinarily, a court may deem such undeveloped "arguments" -- in truth, simple assertions -- as waived.  *Cf. United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)).  Nonetheless, this Court addresses Plaintiff's apparent arguments.

unknown to the deputies, Bryan had torn from the kitchen wall); his failure to throw into the home a cell phone or use a bullhorn to communicate with Bryan; and his refusal to allow Tracy to talk Bryan out of the home or Kim Jones to approach the home.  Keep in mind, according to Plaintiff, the deputies were only "doing what they were ordered to do" (Doc. 203 at 6–7).

This "following-orders" argument is inconsistent with the evidence and Plaintiff's litigation position.  Sheriff Overmyer, Chief Deputy Hirt, and Jose Calvillo all testified that, as TRT team leader, Jose Calvillo took part in the entry team planning.  Indeed, he even altered an important plan detail, transferring the flashbang assignment to Karns after Jose Calvillo had initially considered taking that job on himself.

Evidence with respect to Mario Calvillo is more mixed.  He testified that he was not a party to the Overmyer-Hirt-Emrich-Jose Calvillo discussions that led to the Sheriff giving the order to enter the Jones home.  But Sheriff Overmyer, Jose Calvillo, and Karns testified that Mario Calvillo was involved in other aspects of the entry planning and agreed with the entry plan.

Based on this evidence and the fact that a third-party, Karns, threw the flashbang that was alleged to be a Fourth Amendment violation, Plaintiff asked that the jury be charged for the flashbang claim under a "failure-to-intervene" instruction.  That instruction required the jury to find that either Jose or Mario Calvillo knew the flashbang would be deployed and could have prevented its use (*see* Doc. 182-1 at 9–10).  *See also* Doc. 193 at 4 (granting Plaintiff's motion to conform the pleadings with the evidence with respect to the Section 1983 flashbang claim).  The evidence and Plaintiff's theory of the case refute this post-trial attempt to argue that the deputies blindly followed orders during the entry.  Sheriff Overmyer undoubtedly ordered the TRT to enter the residence.  But both deputies were involved in planning the entry.

17

Even accepting Plaintiff's belated attempts to argue the deputies were not responsible for planning the entry, Sheriff Overmyer's wrongful-death liability depended on a finding that he "d[id] an act or intentionally fail[ed] to do an act which it [wa]s his duty to the others to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct create[d] an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Woods v. Miamisburg City Schools*, 254 F. Supp. 2d 868, 881 (S.D. Ohio 2003) (quoting *Thompson v. McNeill*, 53 Ohio St. 3d 102, 104–05 (1990)).  Having found the Calvillos not liable for the wrongful death claim, no reasonable jury could have found Sheriff Overmyer liable on the same claim.  The jury necessarily found the execution of the TRT entry plan was not reckless or wanton.

### Defense Counsel's Closing Argument

Plaintiff argues defense counsel "ignored this [Court's directive that no party could argue what was "in the mind of Bryan Jones"] and made numerous statements to the jury that unequivocally represented what the Defendants would have the jury believe was in Bryan's mind" (Doc. 188 at 15–16).  Plaintiff lists a series of statements claiming to show defense counsel speculating about Bryan Jones' thought process, attaching a complete transcript of defense counsel's closing argument, highlighting the objectionable statements.  She focuses on two comments in particular, arguing: defense counsel's references to Bryan's suicidal tendencies were unfounded and prejudicial (*id*. at 16), and defense counsel "simply made up th[e] 'fact'" that Bryan racked his shotgun in the moments before he was fatally wounded to "improperly influence the jury" (*id*. at 17).  Citing no evidence as support, Plaintiff claims it would be impossible for Bryan to rack an empty shotgun.

18

Plaintiff made no objection to Defendants' closing argument.  Plaintiff's failure to object does not waive her right to seek a new trial on this basis, but "the degree of prejudice required to obtain a new trial . . . is higher in the absence of objections at trial."  *Park West Galleries, Inc. v. Hochman*, 692 F.3d 539, 548 & n.5 (6th Cir. 2012).  Plaintiff must show that defense counsel engaged in misconduct which "was so outrageous as to warrant reversal of the verdict and a new trial, despite counsel's failure to object."  *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998) (internal quotation marks and brackets omitted).

None of the arguments Plaintiff identifies were improper.  These arguments urged the jury to reach conclusions based on inferences from record evidence; the comments were not unsupported speculation on Bryan's thought process.  Indeed, Plaintiff's counsel's closing argument contains similar remarks, also appropriate commentary on the evidence.  *See, e.g.*, Doc. 191 at 13–14 (arguing "if you disorient the young man [with a flashbang], obviously he can't know that you're telling him something and he can't respond" and further implying that Bryan could not see or hear the deputies), 20 (stating Bryan did not know the deputies were in the home), 24 (arguing Bryan was an alcoholic who knew he needed substance abuse treatment but was not suicidal), 25 (stating Bryan's screaming "why" is "further proof that the young man did not know [the police] were out there").  This Court adopts Defendants' explanation of the evidentiary basis for each comment (*see* Doc. 200 at 26–29), with the following exception.

Defense counsel stated that Bryan Jones "raised and ratch[ed] that gun.  Trooper Nunez [, who testified he heard a shotgun rack just before the shooting,] has nothing to gain and everything to lose by lying.  He heard the shotgun rack.  And Bryan Jones was the one who did it" (Doc. 188-1 at 23).  Trooper Nunez did testify he heard a shotgun rack, but he also testified he did not know who at the

19

scene had racked a shotgun.  And at least one person other than Bryan -- Dorsey -- carried a pump-style shotgun.

While this Court concludes that comment was not improper, even if it was, Plaintiff has not shown prejudice from this stray comment.  The racking comments were a very "small part of counsels' arguments, although they certainly were relevant to the issues" in the case, and were not mentioned in opening argument or during the questioning of any other witness.  *In re Air Crash Disaster*, 86 F.3d 498, 525 (6th Cir. 1996).  This Court further instructed the jury that closing arguments were not evidence (*see* Doc. 182-1 at 5).

And the jury likely discounted Trooper Nunez's testimony, delivered for the first time more than four years after the shooting (no party deposed Trooper Nunez, and Consolo apparently did not interview him).  Trooper Nunez stood roughly 100 feet from the home, and the flashbang and shooting occurred only seconds apart, with no other person on the scene (including the two deputies who claimed to have stared at the barrel of Bryan's shotgun) claiming Bryan racked his shotgun.  Trooper Nunez alone heard the sound of a shotgun rack; he was perhaps mistaken.  But in any event, in view of all the other evidence presented, there is no reasonable probability the jury verdict would have differed without defense counsel's statement that Bryan racked the shotgun.

### Directed Verdict on the IIED Claim

This Court held two charge conferences with counsel during trial week.  Based on these conferences, this Court understood that Plaintiff agreed to dismiss the IIED claim because the damages she might receive on those counts either (1) would only duplicate the damages she would receive under the remaining claims, or (2) potential additional categories of damage were not worth charging the jury on yet another claim.  Plaintiff's counsel "clarified" his position after this Court had already begun to charge the jury (Doc. 193 at 4–7).

20

Plaintiff and Defendants each moved under Federal Civil Rule 50 for directed verdicts on all claims (*see id*. at 4–17).  This Court denied Plaintiff's motions (*id*. at 18–19), and reserved ruling on Defendants' motions except for the motion that targeted the IIED claim.  This Court explained that, as a matter of law, a jury could not find in Plaintiff's favor on her IIED claim, as Plaintiff pointed to no legally sufficient evidence to support either the element of "extreme and outrageous" conduct or causation (Doc. 192 at 3–4).  As reflected in defense counsel's on-the-record basis for the motion, to the extent Plaintiff's counsel provided a factual basis for IIED liability during trial week, it centered on the Sheriff's decision to prevent Kim Jones from approaching the scene (*see* Doc. 193 at 8) ("And as I just stated, the conduct of stopping Mrs. Jones at the road block for her own safety, in light of the threat that her son had made to murder her, is not extreme and outrageous conduct, beyond all bounds of human decency, and that's the very high standard of proof that applies to that claim.").

"Under Rule 50, a court should render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149 (2000) (internal quotation marks omitted).

Plaintiff still has not shown the IIED claim should have reached a jury, and Plaintiff fails to address in full the basis for this Court's Rule 50 order in her post-trial filings.  Plaintiff's opening brief states: "In granting the directed verdict, this Court held that the proof of proximate cause was lacking. This determination was premature.  If the jury had found that Sheriff Overmyer acted recklessly in wrongfully causing Bryan's death, it was that very recklessness in causing the death of Bryan, which then caused the serious emotional distress to his parents" (Doc. 188 at 17).  Similarly, in her reply brief, Plaintiff notes that this Court bifurcated the trial, separating liability issues from damages

issues.[2]  "The element of a sufficiently serious emotional injury, the proof of which the Court found to be lacking, was to be quantified at a later proceeding" (Doc. 203 at 9).  Plaintiff no longer challenges this Court's directed verdict on the IIED claim asserted against Jose or Mario Calvillo.

This Court granted the directed verdict not because Plaintiff failed to show a sufficiently serious injury, an essential element of an IIED cause of action, but because Plaintiff failed to present a jury question on whether the Sheriff's conduct was sufficiently "outrageous," a separate, essential element.  Plaintiff points to no evidence of conduct "so outrageous in character, or so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Thomas v. Progressive Cas. Ins. Co.*, 2011-Ohio-6712, ¶ 19 (Ct. App.) (quoting *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 6 Ohio St. 3d 369, 375 (1983) *abrogated in part on other grounds by Welling v. Weinfeld*, 113 Ohio St. 3d 464 (2007)).  At best, she points to evidence that Sheriff Overmyer acted negligently -- which is legally insufficient to sustain an intentional tort.

---

[2]

This Court bifurcated liability from damages under Federal Civil Rule 42(b) which, in large part, benefitted Plaintiff.  Much of the potential evidence that could have caused unfair prejudice to Plaintiff's case related to Bryan Jones' troubled home life.  Kim and Tracy Jones had "raised the issues of their relationship with Bryan throughout his life and their projected relationship had he survived, including his ability to provide services, protection, care, assistance, society, companionship, comfort, counsel and advice, and his ability to earn future income" (Doc. 134 at 6).  By allowing the jury to focus on Defendants' actions on July 10, the jury did not hear of Bryan Jones' alleged history of domestic violence directed at his parents (*see id*. at 3).

## CONCLUSION

Considered individually or cumulatively, the alleged errors are not grounds for a new trial.

Therefore, this Court denies Plaintiff's Motion (Doc. 188).

IT IS SO ORDERED.

     s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 30, 2015